### BELLSOUTH MOBILITY, INC.

v.

### The PARISH OF PLAQUEMINES, Louisiana, et al.

No. Civ.A. 98–1754.

United States District Court, E.D. Louisiana.

March 11, 1999.

374

Ira Jay Rosenzweig, Smith Martin, New Orleans, LA, Chester Theodore Alpaugh, III, Smith Martin, New Orleans, LA, for Bellsouth Mobility, Inc., plaintiff.

Laurence Kevin Coleman, L. Kevin Coleman, Attorney at Law, New Orleans, LA, for Bonnie Kinnard, Wife of Bruce Gasquet, intervenor.

Regel Louis Bisso, Thomas Francis Gardner, Douglas A. Kewley, Mary Ann Darr Wegmann, Gardner, Kewley & Bisso, Metairie, LA, for Parish of Plaquemines, Louisiana, The, defendant.

## ORDER AND REASONS

FELDMAN, District Judge.

Before the Court are cross-motions for Summary Judgment.[1] Plaintiff BellSouth

Mobility brings a challenge under the Telecommunications Act of 1996 to the decision by defendant Council of the Parish of Plaquemines denying BellSouth's zoning requests for building two cellular phone towers. For the reasons that follow, BellSouth's Motion is DENIED and the defendants' and intervenors' Motions are GRANTED.

### Background

BellSouth Mobility is licensed by the Federal Communications Commission to administer cellular telecommunications in Plaquemines Parish. Reliable service there requires five cellular transmission towers. This suit arises out of BellSouth's efforts to obtain permission to construct two towers on separate parcels of property in the Parish at Jesuit Bend and Nairn; there is no dispute concerning the other three towers. The tower proposed for Jesuit Bend was to be 220 feet tall and self-supporting; the one at Nairn would be 340 feet tall, supported with guy wires. Intervenors Bonnie Kinnard and Bruce Gasquet live on property adjacent to the proposed sites.

BellSouth initially applied for construction permits in December 1997. In the past, the Parish Department of Permits approved other types of transmission towers after notice to adjoining property owners, but without public hearing. Yet, faced with increases in permit applications resulting from the burgeoning cellular communications industry, the Parish Attorney and Parish Zoning Consultant reevaluated this process. They concluded that cellular towers, like radio and television broadcasting towers, were "conditional uses," not "permitted uses." Thus, construction requires a grant of conditional use after a public hearing process under the Compre-

hensive Zoning Ordinance for Plaquemines Parish.

Despite recognizing that a public hearing was required, the Parish Attorney advised the Council that the old procedure should be used in conformity with historical practice. Hence, following notice to adjoining property owners, the Council approved BellSouth's permit applications in early 1998.

In March 1998, the Gasquets sought injunctive relief in state court. The trial court denied relief. While finding that the Council did not follow its own regulations requiring a public hearing, the trial judge concluded that he did not have the authority to issue a preliminary injunction. The judge noted, however, that the same record would support the grant of a permanent injunction if properly presented in such a proceeding.

Later that month, the Council revoked BellSouth's permits in response to the ruling. BellSouth also filed applications for conditional use permits. After public hearing, the Plaquemines Parish Development Board voted not to recommend approval to the Council. The Board did not provide written reasons for its decision.

In May 1998, at the conclusion of another public hearing, the Council denied BellSouth's permit requests as evidenced by two Council Resolutions (Numbers 98–357, 358). BellSouth received written letters of notification in July 1998. The Council did not provide written reasons for the denial beyond the letters and transcripts of proceedings, as well as the documentary record including citizen complaints, petitions, a real estate appraisal, and photographs and other drawings.

---

1. The parties spar over the characterization of their motions. BellSouth identifies its motion as one for partial summary judgment, while the other parties contend that all motions, turning on an interpretation of the Telecommunications Act, should be considered as complete summary judgment motions. Inas-

much as defendants and intervenors briefed all claims in their summary judgment motions, the Court will consider all claims, notwithstanding BellSouth's tactical decision not to respond to all claims raised in the cross-motions.

Following the Council's denial, Bell-South sued the Parish, the Council, and Edward Theriot, both individually and in his capacity as Council President, under the Telecommunications Act of 1996, 47 U.S.C. § 332. BellSouth also sought relief under 42 U.S.C. §§ 1983, 1988. It moves for partial summary judgment on the Telecommunications Act claim. Defendants and intervenors seek summary judgment on all claims.[2]

### Law and Application

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249–50, 106 S.Ct. 2505 (citations omitted).

In addition, if the party opposing the motion fails to establish an essential element of his case, summary judgment is proper. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the summary judgement motion, a court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255, 106 S.Ct. 2505.

### II. Personal Capacity Suit

 The denial of a request for rezoning of a specific parcel of property is a legislative act. Calhoun v. St. Bernard Parish, 937 F.2d 172, 174 (5th Cir.1991); see also Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). As such, members of the Parish Council involved in the zoning decision are entitled to absolute legislative immunity from personal capacity suits. Calhoun, 937 F.2d at 174. This holds true regardless of BellSouth's allegations of discriminatory intent. Id. Thus, the personal capacity claims against Edward Theriot, the Council's president, are dismissed.

### III. Telecommunications Act of 1996

### A. Standards

Congress passed the Telecommunications Act of 1996 to overhaul federal regulation of communication companies. The Act was intended "to provide for a procompetitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition...." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 492 (2d Cir. 1999) (quoting H.R.Conf.Rep. No. 104–458, at 206 (1996)). To that end, Congress added a provision to the National Wireless Telecommunications Siting Policy, 47 U.S.C. § 332(c), which preserves local zoning authority regarding the placement and construction of cellular facilities, while simultaneously imposing certain substantive and procedural limitations on their decision-making power. See Pub.L. No. 104–104, Title VII, § 704(a), 110 Stat. 151 (1996) (codified at 47 U.S.C. § 332(c)(7)).

---

**2.** Because their interests are aligned, the Parish and intervenors will be referred to collectively as "defendants."

More specifically, two substantive restrictions decree that local regulation "shall not unreasonably discriminate among providers" and "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. §§ 332(c)(7)(B)(i)(I), (II). The Act further requires that denials of applications "be in writing and supported by substantial evidence supported in a written record." § 332(c)(7)(B)(iii). Disagreement primarily over this latter provision's meaning animates this dispute.

■ Although Congress did not intend to disrupt the general authority of local zoning authorities, it scaled back the traditionally deferential review, *see Horizon Concepts, Inc. v. City of Balch Springs,* 789 F.2d 1165 (5th Cir.1986) (noting that zoning decisions are reviewed only to determine if they are arbitrary and capricious), explicitly subjecting decisions under the Act to judicial oversight. § 332(c)(7)(B)(v). Thus, denials of zoning requests subject to the Act are reviewed more closely than standard zoning decisions to ensure compliance with the Act's substantive and procedural requirements. *Town of Oyster Bay,* 166 F.3d at 493.

### B. Permit Revocation

■ The Court easily disposes of any claim premised on the revocation of permits issued without public hearing under the Council's old scheme. Subsection (B)(v) [3] permits a suit such as this one, if filed within thirty days of the Council's "final action or failure to act." 47 U.S.C. § 332(c)(7)(B)(v). The Council revoked BellSouth's permits in March 1998. Because BellSouth did not file its complaint until June 1998, its claims with respect to revocation of the initial permits are untimely.

**3.** For sake of clarity, any references to "subsections" will generally omit "47 U.S.C. § 332(c)(7)" as a prefix. Thus, for example,

### C. Conditional Use Proceedings

#### 1. Writing Requirement

■ BellSouth complains that the Council's denial of BellSouth's permit applications did not satisfy the Act's "in writing" requirement because the Council did not provide written reasons for the denial. Although there is support for this position in several district court decisions, *See, e.g., AT&T Wireless PCS, Inc. v. Winston–Salem Zoning Bd. of Adjustment,* 11 F.Supp.2d 760, 764 (M.D.N.C.1998); *Western PCS II Corp. v. Extraterritorial Zoning Authority,* 957 F.Supp. 1230, 1236 (D.N.M.1997), the Court is not persuaded. The Council's letters to BellSouth describing its permit applications as "denied," referencing the Council Resolutions, coupled with the documentary record, satisfies the writing requirement. *See AT & T Wireless PCS, Inc. v. City Council of the City of Virginia Beach,* 155 F.3d 423, 429 (4th Cir.1998).

BellSouth's interpretation of the "in writing" requirement is unsupported by the Act's language and misunderstands the scope of the Act in relation to administrative law generally. For this Court, the Act's words mean what they say; "[t]he simple requirement of a 'decision in writing' cannot reasonably be inflated into a requirement of a 'statement of . . . findings and conclusions, and the reasons or basis therefor.'" *Id.* at 430; *accord Iowa Wireless Servs. v. City of Moline,* 29 F.Supp.2d 915, 920 (C.D.Ill.1998) (holding that writing requirement does not require an "elaborate denial").

When legislation intrudes upon traditional state authority—like the local zoning authority—our republican structure instructs that "we should not quickly attribute to Congress an unstated intent." *Pennhurst State Sch. and Hosp. v. Halderman,* 451 U.S. 1, 16, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). If Congress intended

subsection (B)(v) refers to 47 U.S.C. § 332(c)(7)(B)(v).

the "in writing" provision to impose an additional requirement that local authorities produce judicial opinion-like written reasons, with formal findings and conclusions, it would have said so in the language of the Act. *PrimeCo Personal Communications, L.P. v. Village of Fox Lake,* 26 F.Supp.2d 1052, 1061 (N.D.Ill.1998). Congress could have defined the Act's writing requirement with reference to comparable provisions in the Administrative Procedure Act. *See, e.g.,* 5 U.S.C. 557(c) (requiring decisions to include a "statement of ... findings and conclusions, and the reasons or basis therefor...."). But it did not.

Like the APA, other portions of the Act explicitly require written reasons for certain actions. *See* 47 U.S.C. § 160(c) (requiring FCC to "explain its decision in writing" when acting on petition for forbearance); *id.* at § 204 (requiring FCC to provide carrier with "statement in writing of its reasons" for suspension of charges); *id.* at § 252(e)(1) (requiring "written findings as to any deficiencies" of interconnection agreements); *id.* at § 271(d)(3) (requiring FCC to "state the basis for its approval or denial" of certain applications); *cf. id.* at § 213 (requiring FCC to provide "reasons" for denying access to valuation records). Thus, it is clear that "Congress knows how to demand findings and explanations and that it refrained from doing so in section (B)(iii)". *AT & T Wireless,* 155 F.3d at 430.

BellSouth's call for an adjudicative decision-making model also sharply conflicts with section (B)(7)(A), which preserves local authority over zoning decisions, traditionally following a legislative model. Claiming that the writing requirement requires judicial-like reasons is nothing more than an "ill-defined insistence on facilitating federal judicial review...." *Shelton v. City of College Station,* 780 F.2d 475, 482 (5th Cir.1986). The Fifth Circuit previously recognized that imposing the adjudicative model would "alter the decisional process of zoning issues." *Id.* at 481. Without an explicit statement from Congress, the writing requirement cannot be read to effect such a dramatic upheaval in the local authority. Accordingly, the Court refuses to read this subsection to require anything more than a plain written statement of denial.[4]

Of course, subsection (B)(iii) altered local zoning authority insofar as it requires denials to be supported by substantial evidence in a "written record." It is this distinct provision, not the "in writing" requirement, which ensures an adequate basis for judicial review. *AT & T Wireless,* 155 F.3d at 430; *see also Gearon & Co. v. Fulton County,* 5 F.Supp.2d 1351, 1354 (N.D.Ga.1998). As discussed below, the written record contains substantial evidence supporting the Council's decision.

Finally, BellSouth emphasizes the fact that the Council did not send written notice of the denials until July 8, 1999, more than thirty days after the meeting at which the permits were denied. If the purpose of the writing requirement is to provide notice to an aggrieved party to enable a timely appeal, then BellSouth has no cause to complain. BellSouth obviously was not prejudiced by any delay; it knew its permit was denied and filed this timely appeal. *See* 47 U.S.C. § 332(c)(7)(B)(v) (allowing thirty days to file appeal).

### 2. *Substantial Evidence*

The Court is satisfied that the Council's denial of BellSouth's application was supported by substantial evidence. The substantial evidence standard describes the quantum of evidence that a reasonable mind might accept as adequate to support a conclusion: it is more than a

4. Nevertheless, as one court advised, local authorities should consider supplying written reasons, for it might be "foolhardy to rely on the goodwill of federal courts to ferret through state administrative records in search of substantial evidence" to support the denial. *PrimeCo,* 26 F.Supp.2d at 1062. Even if not required, written reasons undoubtedly would facilitate review.

scintilla, but less than a preponderance. *Director, Office of Workers' Comp. Programs v. Ingalls Shipbuilding, Inc.,* 125 F.3d 303, 305 (5th Cir.1997).

The Council's decision need not be the sole inference that can be drawn from the facts. Thus, the Council is entitled to this Court's deference. *Id.* Even if the record supports BellSouth's view, this Court cannot disturb the Council's decision if there is substantial evidence to support the Council's view. *Corrosion Proof Fittings v. EPA,* 947 F.2d 1201, 1213 (5th Cir.1991).

When assessing the Council's decision, the Court refers to the local zoning ordinance to determine what considerations informed the Council's decision. *Town of Oyster Bay,* 166 F.3d at 494; *Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho–Ho–Kus,* 24 F.Supp.2d 359, 366 (D.N.J.1998). According to the Comprehensive Zoning Ordinance, a grant of conditional use for construction of Bell-South's towers shall be authorized when such use: a) promotes the public interest; b) preserves the public welfare; c) will not injure neighboring property; d) conforms to district regulations; and e) conforms to any additional conditions deemed necessary to secure the objectives of the Ordinance so as to not adversely affect neighboring properties.

██ It also is well understood that local authorities can implement zoning restrictions to preserve the aesthetic features of neighborhoods. *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 129, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Indeed, a concern for aesthetics could be inferred into several of the above factors.

BellSouth charges that opposition to its permits was merely anecdotal and unsupported citizen complaints, and thus incapable of amounting to substantial evidence. Several courts agree that generalized citizen concerns cannot thwart a cellular company's permit applications. *See, e.g., Omnipoint Communications, Inc. v. City of*

*Scranton,* No. 97–0562, 1999 WL 66110, at *6 (M.D.Pa. Jan. 26, 1999) (rejecting "generalized concerns"); *Petersburg Cellular Partnership v. Board of Supervisors,* 29 F.Supp.2d 701, 706 (E.D.Va.1998) (rejecting "substantively vague" opposition). To be sure, the Court recognizes that an uncritical review and reflexive acceptance of constituent complaints could result in the defeat of cellular companies' applications in every instance; sanctioning permit denials based upon few generalized concerns would frustrate the Act's purposes. *See PrimeCo,* 26 F.Supp.2d at 1063.

██ Nevertheless, the record discloses more than mere generalized or caustic "not-in-my-backyard" complaints. Citizens raised substantial questions concerning BellSouth's site selection that went largely unanswered. This is not even a case in which BellSouth assaulted nonexpert citizens with a barrage of experts, exhibits, and evaluations to surmount their lay opinions. *Cf. AT & T Wireless,* 155 F.3d at 431 (noting that allowing the "predictable barrage" of experts to overcome nonexpert citizens' concerns would "thwart democracy"). Rather, resting on its self-serving applications and emphasizing its monetary investment, BellSouth demands that the Parish pave the way for its towers as if the Act bestowed absolute dominion over the Parish. "Congress, in refusing to abolish local authority over zoning or personal wireless services, categorically rejected this scornful approach." *Id.*

The record contains several letters, petitions, and testimony complaining about the aesthetic damage the towers would cause. Bruce Gasquet complains that an unobstructed view to a giant cellular tower will destroy the character of his rural home. Duhe Scandurro disapproves of the towers because they will change the character of the rural area in which he wishes to retire. Leander Perez, State Representative Benny Rousselle, and others echo these common themes, asking that the towers be placed further away from residential neighborhoods.

Gasquet also complains that his property value will be diminished. His view is supported by a certified real estate appraiser's opinion. BellSouth attacks this report as unsubstantiated, but offers little in response. BellSouth mentions its own survey showing no loss in value, but the report was not presented to the Council; moreover, its appraisal is not relevant insofar as it relates to Belle Chasse, a substantially different neighborhood just outside New Orleans. *See Borough of Ho-Ho-Kus,* 24 F.Supp.2d at 371. (People are attracted to the rural Parish for reasons presumably quite different than those who seek semi-country homes a short commute away from the City.)

BellSouth maintains that its towers are needed to provide adequate service, including emergency 911 service, and service to the National Guard. Still, it does not explain why the Nairn and Jesuit Bend sites are all-critical. Kevin Coleman suggests moving the sites to more open pastures; Ted Carrera questions whether BellSouth could construct more, smaller towers in more remote areas. BellSouth only casually responds that more towers would affect more people; conspicuously, it does not answer whether less-obtrusive sites would be a viable alternative for smaller towers. Furthermore, when asked directly by a Council member, "How large of a search area do you have?," a BellSouth representative answers, "it depends. It could be about a mile. It just depends on the search area."

BellSouth concedes that other sites are available; it complains, however, that it once before moved a site due to citizen opposition. Nevertheless, BellSouth has not explained whether *other* sites could have been used beyond the only two sites it bothered to consider. When asked by the Council, a company representative did not know if the site locations could have been moved more to the south.

BellSouth explains that it chose one site because it already contained an insurance office and a limestone facility. Of course, this site does not have a three-hundred foot tower on it. Nor does BellSouth explain whether other commercial sites would have proved usable. It suggests that other sites would require clearing trees to make room for a tower. Nevertheless, a tower with a small base hidden in the trees may be preferable to one in an open space directly behind someone's home, rural or otherwise.

Only one citizen spoke on behalf of BellSouth, and he was the person who leased his property to BellSouth. The company emphasizes its substantial investment in the sites, but one citizen points out that he has likewise invested much in his home. Finally, BellSouth does not respond to one citizen's charge that the towers will offer no benefit to the Parish in terms of creating jobs.

BellSouth offers little to justify its site selection. The citizens' concerns coupled with BellSouth's failure to rebut complaints about the site selection process provided the Council with substantial evidence to deny BellSouth's applications.

3. *Discrimination Among Providers*

There is no basis for concluding that the Council discriminated against BellSouth. Three of five BellSouth permits were approved without any resistance. There is no suggestion that the Council favored one cellular carrier over another for the Nairn and Jesuit Bend sites.

 Any claim that the Council unlawfully distinguishes between cellular providers on the one hand, and other communications and broadcasting companies on the other, is misplaced. The Act only prohibits discrimination "among providers of functionally equivalent services." Thus, the Act's anti-discrimination clause only extends to personal wireless services, not to conventional telephone or broadcasting services. *City of Scranton,* 36 F.Supp.2d at 234.

 In any case, the Act prohibits only "unreasonable" discrimination. *AT & T*

*Wireless,* 155 F.3d at 427; *Borough of Ho-Ho-Kus,* 24 F.Supp.2d 359, 374 (D.N.J. 1998). Parish citizens opposed BellSouth's applications primarily on grounds that the towers would upset the residential character of the neighborhood and cause aesthetic blight. As the Fourth Circuit observed, if denials resting on these "traditional bases of zoning regulation" are unreasonable, "then nearly every denial of an application such as this will violate the Act, an obviously absurd result." *AT & T Wireless,* 155 F.3d at 427 (citing Conference Report). Although BellSouth points to a limestone operation on one of the proposed sites, there is no suggestion that similar structures like the two- and three-hundred foot BellSouth towers are found on these sites. Absent similar structures having been allowed on the sites, the Court cannot infer discriminatory intent in denying BellSouth's permits.

Furthermore, as evidenced by its complaint, BellSouth charges that the Council discriminated based only the complaint that the Council's denial did not comport with the Act's writing and substantial evidence standard. As discussed above, the Council's decision satisfied this standard. Thus, there are no grounds for finding discrimination.

### 4. *Prohibition of Service*

██ Seizing on the Act's statement that local regulations "shall not prohibit or have the effect of prohibiting the provision of wireless services," 47 U.S.C. § 332(c)(7)(B)(i), BellSouth suggests that the Council breached the Act simply by denying the Nairn and Jesuit Bend permits. BellSouth attempts to transmute this general measure ensuring fair determinations into a *guarantee* that cellular providers will be able to set up shop wherever and whenever they want. Plainly, BellSouth overstates the scope of this provision.

The denial of a single zoning application cannot, by itself, amount to a prohibition of cellular services. Subsection (B)(i) only applies to "blanket prohibitions," not individual zoning decisions. *AT & T Wireless,* 155 F.3d at 428; *Iowa Wireless,* 29 F.Supp.2d at 923. A contrary reading "would effectively nullify local authority by mandating approval of all (or nearly all) applications," disrupting the Act's overall scheme preserving local zoning authority. *AT & T Wireless,* 155 F.3d at 428.

██ This provision cannot be read to divest local authorities of power to prohibit facilities in certain locales if supported by substantial evidence. Indeed, the Act expressly contemplates the power to deny a zoning request. *Id.* Furthermore, the record demonstrates that the Council has approved at least three other BellSouth towers, as well as allowing construction of other providers' facilities; this hardly amounts to a "prohibition" of cellular services. *See Omnipoint Communications,* 36 F.Supp.2d at 233. Moreover, there appears no impediment to BellSouth reapplying for permits at different Parish locations.

### IV. *Section 1983 and 1988 Claims*

Because the only asserted basis for BellSouth's civil rights claims is a violation of the Telecommunications Act, these claims necessarily fall with the claims under the Act. Finding no violation under the Act, these claims have no merit.

### *Conclusion*

For the foregoing reasons, plaintiff BellSouth's Motion for Summary Judgment is DENIED. Defendants' and Intervenors' Motions for Summary Judgment are GRANTED.