**360 COMMUNICATIONS COMPANY, Plaintiff,**

**v.**

**BOARD OF SUPERVISORS OF ALBEMARLE CO., Defendant.**

**No. Civ.A. 98–0099–C.**

United States District Court, W.D. Virginia, Charlottesville Division.

May 19, 1999.

---

Melvin Earl Gibson, Jr., Patricia D. McGraw, Tremblay & Smith, Charlottesville, VA, for 360 Communications Company of Charlottesville, plaintiff.

Larry Wade Davis, Charlottesville, VA, Gustav Gregory Kamptner, Albemarle County Attorney's Office, Charlottesville, VA, for The Board of Supervisors of Albemarle County, defendant.

### ORDER

MICHAEL, Senior District Judge.

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

### ADJUDGED AND ORDERED

that:

(1) The Magistrate Judge's Report and Recommendation will be adopted in so far as it recommends summary judgment in favor of plaintiff.

(2) Defendant's objections to the Report and Recommendation are DENIED.

(3) Defendant's motion for summary judgment shall be, and hereby is, DENIED.

(4) Plaintiff's motion for summary judgment shall be, and hereby is, GRANTED. The defendant's "Resolution to Deny SP 98–03" is in violation of the Telecommunications Act of 1996 and is, therefore, null and void. Defendant, its officers, boards, commissions, departments, and instrumentalities shall approve the plaintiff's construction of the proposed tower as detailed in Application SP 98–03, including all conditions detailed in the Albemarle County Planning Staff report, and shall issue any required permits within 45 days of the entrance of this Order. The Board of Supervisors of Albemarle County shall remove any further impediments to the plaintiff's construction of the communications tower.

(5) Plaintiff's request for attorneys' fees shall be, and hereby is, DENIED.

The Clerk of the Court is hereby directed to send a certified copy of this Order to all counsel of record and to Magistrate Judge Crigler.

### MEMORANDUM OPINION

#### INTRODUCTION

This is an action for declaratory and injunctive relief, brought under the Telecommunications Act of 1996, 47 U.S.C. § 332(c) ("Telecommunications Act," "TCA" or "Act"). On September 16, 1998, the Board of Supervisors of Albemarle County ("Board") denied 360° Communications Company's ("360°") application for a special use permit to erect a cellular telephone communications tower on the ridge top of Dudley Mountain.[1] Before the court are the parties' cross motions for summary judgment.[2] Plaintiff and Defen-

---

1. The application was to build a tower on Tax Map 89, Parcel 18, located on the west side of Route 706 in Albemarle County.

2. Magistrate Judge B. Waugh Crigler conducted a hearing on the parties' cross motions

and issued a thorough, well-reasoned, and exceptionally helpful Report and Recommendation on February 22, 1999. The Magistrate Judge recommended that this court grant summary judgment in favor of plaintiff and declare that the Board's decision was incon-

dant agree that there are no material facts in dispute.

Upon consideration of the pleadings and briefs submitted by the parties, the arguments of counsel, and the exhibits submitted by the parties, the court finds that the plaintiff's motion for summary judgment shall be granted.

## FACTUAL AND PROCEDURAL HISTORY

360° Communications provides telecommunications services in Virginia, including Albemarle County. The defendant is the governmental authority of Albemarle County, a political subdivision of the Commonwealth of Virginia, and has the authority to approve special use permits, including those for telecommunications towers. On January 26, 1998, 360° Communications filed an application for a special use permit to erect a self-support telecommunications tower to be located at or near the ridge line of Dudley Mountain. (Record at 5).[3] The tower would provide significantly improved cellular telephone service in southern Albemarle County along U.S. Route 29 [4] by providing service in an area that is largely without coverage. Scatter plots indicate that coverage in this area is poor to non-existent.[5] There are no existing tall structures in the area on which antennas can be mounted. The leased site is presently vacant timberland. Access to the site would be provided by an existing logging road and by a new road connecting the logging road to the tower.

Albemarle County is predominantly rural and its unique topography limits the available design options for a wireless system that will effectively serve both residents and visitors. U.S. Route 29 runs through Albemarle County and is one of the most important travel corridors in the area. Albemarle County has attempted, where possible, to preserve its rural character and doing so is a stated goal of its Comprehensive Plan.[6]

On June 2, 1998, the Albemarle County Planning Commission (the "Commission") recommended denial of plaintiff's application for a special use permit allowing the construction of a wireless communications tower. (Record at 3). On August 12, 1998 the Board of Supervisors conducted a hearing on plaintiff's application. The Board heard extensive evidence presented by the plaintiff and heard from citizens present at the hearing. In an effort to determine the visibility of the tower, 360° conducted two separate balloon tests. The first balloon test depicted the effect of a 150' tower. The second test depicted a 100' tower. Plaintiff argues that pictures taken of the 100' height test show that the tower would not be easily visible. Plaintiff next furnished the Board copies of recent tower applications that had been approved and photographs of the towers. The

sistent with the Telecommunications Act in that it prohibited or had the effect of prohibiting the provision of wireless service. Alternatively, the Magistrate recommended that the court declare that the Board's decision is not supported by substantial evidence in the record. The Magistrate Judge further recommended that the court direct the Board to issue the special use permit for the construction of the transmission facilities as specified in the plaintiff's modified application. Finally, the Magistrate recommended that the court deny plaintiff's request for attorneys' fees. This court has carefully considered the report and recommendation as well as the pleadings in the case and has undertaken a *de novo* review of the entire case. *Orpiano v. Johnson,* 687 F.2d 44, 48 (4th Cir.1982).

3. This application included several alternative construction designs. 360° offered to erect either one 150' self-support tower or three 100' self support towers. The application has since been modified and plaintiff agrees that it can build one 100' tower to accommodate its needs.

4. U.S. Route 29 is one of the two major highways transecting Albemarle County.

5. Scatter plots are computer generated models which predict cellular coverage.

6. A comprehensive plan is a plan for the physical development of the territory within a locality's jurisdiction. VA. CODE § 15.2-2223. The plan is general in nature and shows the locality's long-range recommendations for the development of the territory. *Id.*

Board heard testimony that these towers were more visible than the tower requested by 360°.

The first expert to testify before the Board was 360° Communications' radio frequency engineer. The engineer explained that 360° chose the site to meet its objective of providing cellular coverage along U.S. Route 29 and Routes 706, 631 and 712 on both the eastern and western sides of Dudley Mountain. It was the engineer's opinion that the base elevation of this site makes it optimal for meeting 360°'s coverage objective. The engineer additionally testified that the tower needs to be 40' above the tree line because of the density of the surrounding forest. There is no indication in the record of the hearing that any Board member asked questions of the engineer.

In order to address the Board's request that 360° explore alternatives to the Dudley Mountain site, Robert Denny, a consulting engineer, testified. Mr. Denny conducted an analysis of several alternatives using computer modeling technology. Based on this analysis, Mr. Denny discussed two alternatives to the Dudley Mountain site. The Board heard that to provide the same level of coverage, 360° would have to construct as many as six 100' towers located at other sites at lower elevations on Dudley and surrounding mountains. Alternatively, 360° would have to construct between twenty and twenty-four antennas along the side of the road to provide coverage to the area. Mr. Denny testified that the proposed site is unique in the vicinity sought to be covered and provides service to the largest geographic area with the fewest number of towers and the shortest tower height.

Mr. Denny fielded two questions from two Board Members. David Bowerman asked, in sum, whether the tower would have to be located at such a high elevation if the technology employed was digital instead of analog. Mr. Denny maintained that his opinion remained the same whether the signal was analog or digital and emphasized the antenna had to be of a sufficient height to provide effective service. Sally Thomas asked about the application of a "new" technology, combiners. Mr. Denny testified that combiners have been used since World War II and have been a part of cellular technology from its inception. Mr. Denny additionally explained that combiners would be used at the Dudley Mountain site because the site will house more than one transmitter.

The Board next heard from Derek Johnson, a consulting engineer, who testified about the construction of an access road to the tower site. Mr. Johnson stated that 360° planned to make improvements to an existing logging road and construct a new road to connect the existing road with the site. Mr. Johnson testified that the new and improved road is necessary for some construction access and for the two trips per month that are needed for maintenance. Mr. Johnson informed the Board that the tower and site building will be helicoptered in for placement. Mr. Johnson faced questioning from three of the six Board Members. First, Forrest Marshall asked whether the new road construction would occur entirely on the land leased by 360°. Mr. Johnson said that it would. Second, Charlotte Humphris and Sally Thomas inquired about a prior report issued by Mr. Johnson's engineering firm that indicated the impossibility of constructing a road that complied with the conditions of approval contained in the Albemarle County Planning Staff Report.[7] Mr. Johnson offered two explanations for his opinion that the road could be constructed to meet the conditions of approval required by the Board. First, Mr. Johnson stated that the initial report indicating

---

7. The court assumes that the Board members and Mr. Johnson were making reference to the Staff Report contained in the record before the court. The report before the court, however, does not make mention of specific conditions of approval related to construction of the road. A review of the minutes from the Board's August 12, 1998 hearing, however, indicates that all parties understood the nature of the conditions.

an inability to construct the road was based on figures for the site slopes that were estimates. His revised opinion, however, relied on "hard" numbers. Second, Mr. Johnson said that the Albemarle County Planning Staff revised its conditions of approval to include a provision permitting the use of "retaining walls, revetments, other stabilization measures acceptable to the County Engineer." (Record at 43). After this explanation, the Board did not follow up with additional questions.

Finally, the Board heard from Chris Burns, General Manager for 360° Communications in the Charlottesville area. Mr. Burns testified that 360° receives about twenty calls a week about the inadequate service in the Dudley Mountain area. This testimony concluded 360°'s presentation, the Board asked no additional questions, heard from no additional experts, and opened the hearing to public comments.

Eleven citizens spoke before the Board. Ten of the eleven citizens opposed 360°'s application. Stephen Thornton owns a farm directly east of the proposed tower site. He said that the tower would directly overlook his property and that any erosion from the tower site will run down to his property. Mr. Thornton also opined that there was no way to improve the existing logging road and offered that the technology employed by 360° is "outmoded." (Record at 44). Mr. Thornton suggested that within a "a month or two" a true "Dick Tracey" type communications system will be available. This system will be supported by "35 satellites up in space." (Record at 44). David Van Roijen presented a petition signed by 40 citizens opposed to the tower and stated that he believed that 360° does not "Have to have [the tower] to be able to have cellular communications." (Record at 44). Mr. Van Roijen also voiced his concern that permitting this tower would lead to additional mountain-top towers. A twelve-year-old girl testified that she believed the

tower would be ugly. Jim MacIlnerny said that he just built a house in view of the tower and was of the opinion that cellular service in the area was acceptable. Jess Dorman suggested that the mountain is too steep to accommodate a road and will require extensive use of retaining walls. Mr. Dorman also argued that 360°'s aerial photographs had been manipulated to minimize the visibility of the proposed tower. MaryAnne Rodeheaver said that the tower would mar the skyline and that the "number one cause of accidents in automobiles today is cellular phones ..." (Record at 45). Helen Gallion–Austin testified that she valued the scenic beauty of the mountains more than cellular service. Jay Closure said that he is opposed to the tower because he would have to look at it and also expressed concerns about erosion for those who live near the tower site.[8] Mr. T.K. Woods owns property adjacent to the site and has placed this property in a conservation easement. He testified that he placed his property in a conservation easement "just so this sort of thing would not happen." (Record at 45). Mr. Woods also expressed concern about erosion. Ollie Fitzgerald testified that he has driven up the logging road to the top of Dudley Mountain and believes that the road is viable. An unidentified man testified that wireless towers are "eyesores." (Record at 46).

360° Communications responded to the citizen comment by addressing only the issue of alternative technology. Robert Denny, 360°'s consulting engineer, explained that the use of satellite phones will not be an economical alternative to cellular phones in the near future. David Bowerman asked whether other "consortiums" are in the process of employing satellite based wireless phone systems and commented that Mr. Denny underestimated the rapidly developing technology in this area. Mr. Denny maintained his position that as a consulting engineer who practices

---

8. Mr. Closure does not live next to or in close proximity to the site, but rather owns property across from Dudley Mountain.

before the FCC frequently, his opinion is that a satellite based system is ten years away from widespread use.

Following the close of public comments, Supervisor Sally Thomas commented that 360°'s application "is the most complete application in detail that the Board has gotten from any applicant." (Record at 49). Ms. Thomas went on to comment that the application "Unfortunately ... shows from how far away the tower can be seen. It makes the impact this site will have on the visual character of the area all the stronger." (Record at 49). Ms. Thomas expressed that she believes the Board should have learned from its mistakes and that this site is "too heavenly of a location for a terrestrial system." (Record at 49). Instead of voting on the application, the Board deferred its vote pending the preparation of a staff report to serve as a written record of its denial of the permit.[9]

On September 16, 1998, the defendant unanimously approved a resolution denying 360°'s permit application. Despite the redundancy in the Board's resolution, the Board denied 360°'s application for three reasons: (1) the tower's height and location on a mountain top make it visible and aesthetically unpleasing; (2) the tower is too close to adjacent land; (3) the tower would require improvement of an existing logging road and this improvement would disturb critical slopes which results in erosion problems and "scars"[10] the mountain.

In its resolution, the Board first found that the tower would be inconsistent with the County of Albemarle's Comprehensive Plan. The Board determined that the tower would be inconsistent for two reasons: (1) the tower would modify the visual character of the area due to its height; (2) the

tower would require the disturbance of 600 linear feet on critical slopes to improve the access road. Second, the Board found that the tower would be a substantial detriment to adjacent property and would change the character of the rural district. The Board made this finding because the tower would be 40 feet from the closest property[11] and reiterated that 600 feet of critical slopes would be disturbed.[12] The Board supported its view that the character of the rural district would be changed by noting that the tower would be visible on the mountain ridge top. Fourth, the Board found that the tower would be inconsistent with sections 1.4.3 and 1.6 of the zoning ordinance. The tower would be inconsistent because of its "visual impact on the entrance corridor and the surrounding area" and because the improved access road would scar the mountain. Resolution to Deny SP 98–03 at Record 158. Following adoption of this resolution, plaintiff filed suit in this court.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact ..." Id.; See Anderson v. Liberty Lobby, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The parties agree that there are no genuine issues of material fact. It is, therefore, appropriate for the court to decide the case.

9. Because the Board wanted a written staff report stating reasons for the denial, the Board voted to request the report and indicated in the minutes that a vote to request the report was in effect a vote to deny the permit. (Record at 49).

10. The "scar" caused by the road can also be characterized as another aesthetic concern, separate from the problems related to erosion.

11. The closest property is Arrowhead Farm which is in a conservation easement.

12. There was no evidence before the Board about the tower's impact of property values. The Board did not discuss this issue and it does not appear to be a basis for its decision.

## THE TELECOMMUNICATIONS ACT OF 1996

The Telecommunications Act of 1996, 47 U.S.C. § 332(c), represents the first major rewrite of our nation's telecommunications policy since the 1934 Communications Act. The 1996 Act redefines and recasts the 1934 Communications Act to address the relationship among the growing list of communications services, service providers, and users. In doing so it establishes a single, comprehensive blueprint for telecommunications policy that addresses the changing telecommunications environment. In the words of the Conference Committee, the TCA was meant:

> to provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services ... by opening all telecommunications markets to competition ...

H.R.Conf.Rep. No. 104–458, at 206 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124,124. The TCA represents the federal government's policy determination that in order for all citizens to join the information age, they must have access to increasingly sophisticated communications technologies at competitive rates.

The Telecommunications Act was designed in part to promote competition in the personal telecommunications industry by limiting the authority of local governments to regulate or control the expansion of telecommunications technology. *See*

*Omnipoint Communications v. City of Scranton,* 36 F.Supp.2d 222 (M.D.Pa.1999) (citations omitted). Section 704 of the TCA attempts to implement the Act's goals by creating a national standard for the consideration by zoning authorities of personal wireless facility applications. 47 U.S.C. § 332(c)(7). The standard contains three main components: regulations of radio frequency radiation, prohibitions against activities that effectively bar the provision of wireless service or discriminate among providers, and a mandate to the governing authorities to conduct the local hearing process in a manner that ensures due process and timely decisions.[13] *Id.* At issue in this case are: (1) the Act's substantive limitation on local authority requiring that zoning regulations "shall not prohibit ... the provision of personal wireless services," § 332(c)(7)(B)(I)(II), and (2) the Act's procedural mandate that zoning denials be based on substantial evidence, § 332(c)(7)(B)(iii).

## ANALYSIS

Following the Magistrate Judge's issuance of his Report and Recommendation, defendant submitted objections to virtually every sentence in the Report. Resolution of this matter, however, does not require the court specifically to address each of the defendant's individual objections. The case can be boiled down to two central issues: (1) whether the Board's denial of plaintiff's permit application is supported by substantial evidence; (2) whether the

---

**13.** Section 704(c)(7) of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, codified at 47 U.S.C. § 332(c)(7), provides in relevant part:

(A) General Authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The Regulation of the placement, construction, and modification of personal wireless service facilities by any State or

local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

...

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

zoning ordinances and policies relied upon by the Board in considering plaintiff's permit application have the effect of prohibiting the provision of personal wireless service. For reasons discussed in greater depth below, the court holds that the denial of plaintiff's permit application is supported by substantial evidence in the record but that the zoning ordinances and policies relied upon by the Board have the effect of prohibiting the provision of wireless service. The court should be clear to note that its review of the evidence before the Board is constrained by recent Fourth Circuit precedent. In that light, the court finds here that the Board's decision is supported by substantial evidence in the record.

### Substantial Evidence

A number of district courts as well as the Second and Fourth Circuits have addressed the Act's substantial evidence requirement. *See, e.g., Cellular Telephone Company v. Town of Oyster Bay,* 166 F.3d 490 (2nd Cir.1999) (holding that court must look to the record as a whole to see whether there is substantial evidence to deny the permit and requiring that the substantial evidence be evidence of some legitimate reason for rejecting the application); *AT & T Wireless PCS v. City Council of the City of Virginia Beach,* 155 F.3d 423 (4th Cir.1998); *Petersburg Cellular Partnership v. Board of Supervisors of Nottoway County,* 29 F.Supp.2d 701 (E.D.Va.1998); *Cellular Telephone Co. v. Borough of Ho–Ho–Kus,* 24 F.Supp.2d 359 (1998). These cases, and the others analyzing the Act's substantial evidence requirement, evince two general trends of interpretation: (1) rigorous review of local zoning decisions; (2) substantial deference accorded local zoning decisions. *See PrimeCo Personal Communications v. Village of Fox Lake,* 26 F.Supp.2d 1052 (N.D.Il.1998). The rigorous review trend represents the majority of decisional authority on this issue. *Id.* The deferential approach is represented by the Fourth Circuit and a small number of district court decisions. *Id.*

■ The Fourth Circuit has recently addressed the Act's substantial evidence requirement in two opinions. *See AT&T Wireless PCS v. Winston–Salem Zoning Bd. of Adjustment,* 172 F.3d 307 (4th Cir. 1999) (hereinafter *Winston–Salem*); *AT & T Wireless PCS, Inc. v. City Council of Virginia Beach,* 155 F.3d 423 (4th Cir. 1998) (hereinafter *Virginia Beach* ). These opinions represent the Fourth Circuit's view that zoning decisions made by local legislative bodies are to be accorded deference where the decision is supported by "the widespread opposition of a majority of the citizens ... who voiced their views ..." *Virginia Beach,* 155 F.3d at 431. One district court has characterized the Fourth Circuit as appearing "to view the substantial evidence requirement as similar to the 'invidious or irrational' test used to review due process challenges to zoning decisions." *PrimeCo Personal Communications,* 26 F.Supp.2d at 1061 (citations omitted).

Prior to passage of the Telecommunications Act, federal courts agreed that zoning decisions could be based on political considerations and subjective concerns. *See, e.g., Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 467 (7th Cir. 1988) ("[N]othing is more common in zoning disputes than selfish opposition to zoning changes. The Constitution does not forbid government to yield to such opposition."). Following the TCA's passage, however, several courts expressed the belief that the Act limits zoning board considerations to "demonstrable facts, actual 'evidence' as that term is used in judicial and quasi-judicial agency proceedings ..." *PrimeCo Personal Communications,* 26 F.Supp.2d at 1060. These courts have held that constituent 'testimony' at zoning hearings does not constitute substantial evidence, especially where that testimony is unsupported or contradicted by evidence in the record or where the testimony goes to criteria that a local government cannot consider in making a zoning decision. *See, e.g., BellSouth Mobility Inc. v. Gwinnett County,* 944 F.Supp. 923, 928 (N.D.Ga.

1996) (testimony by neighborhood representative that the cellular tower would (1) pose a threat to neighborhood children, (2) be visible from the front window of 20 houses in the neighborhood, and (3) not be aesthetically compatible with existing land use does not constitute substantial evidence). In essence, the rigorous review courts seem to strike a compromise between sections A (preserving local zoning authority) and B (proscribing local zoning authority). 47 U.S.C. § 332(c)(7)(A) and (B). These courts require constituent testimony to relate to permissible zoning criteria and be supported by at least some evidence in the record. This balancing act is an attempt to reconcile Congress' desire to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies ..." with the concomitant desire to preserve local control of zoning issues. H.R.Conf.Rep. No. 104–458, at 206 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 124.

The Fourth Circuit instructs that this court's review of the evidence before the Board must be deferential because:

> The Virginia Beach City Council is a state legislative body, not a federal administrative agency. The "reasonable mind" of a legislator is not necessarily the same as the "reasonable mind" of a bureaucrat, and one should keep the distinction in mind when attempting to impose the "substantial evidence" standard onto the world of legislative decisions. It is not only proper but even expected that a legislature and its members will consider the views of their constituents to be particularly compelling forms of evidence, in zoning as in all legislative matters. These views, if widely shared, will often trump those of bureaucrats or

experts in the minds of reasonable legislators.

*Virginia Beach,* 155 F.3d at 430.

In both *Virginia Beach* and *Winston–Salem,* the Fourth Circuit found that constituent concerns [14] about the impact of a wireless tower's aesthetics constituted substantial evidence. *Virginia Beach,* 155 F.3d at 425, 430–431 (citizen complaints that tower would be an eyesore sufficient to find substantial evidence despite Planning Department's report recommending approval, Planning Commission recommendation of approval, and testimony of provider's experts indicating necessity and minimal impact of tower); Winston–Salem, 172 F.3d at 310, 316 (testimony by eight citizens as to the tower's visibility, its impact on the aesthetics of the neighborhood, and its negative effect on the desirability of the neighborhood coupled with the negative impact tower could have on nearby historic house constitutes substantial evidence).

In appearing to rely on traditional views of a zoning board's authority, the approach taken by the courts in *Virginia Beach* and Winston–Salem could allow local governments to deny most all cell tower permit applications. The Telecommunications Act narrows to some degree the traditional view of deference accorded zoning board decisions. Furthermore, this Circuit's holdings that permit constituent concerns about aesthetics to constitute substantial evidence may be in conflict with Virginia law. In the words of the Supreme Court of Virginia, "a county cannot limit or restrict the use which a person may make of his property under the guise of its police power where the exercise of such power would be justified solely on aesthetic considerations." *Board of Supervisors of James City County v. Rowe,* 216 Va. 128, 216 S.E.2d 199 (1975) (citing *Kenyon Peck v. Kennedy,* 210 Va. 60, 64, 168 S.E.2d 117, 120–21 (1969)). While this state law is not

14. The Virginia Beach court repeatedly explains that the constituent opposition to the tower was "widespread" and came from "numerous area residents." 155 F.3d at 431, 425.

a governing factor in this case, any conflict between state and federal law should be avoided. This court is, however, bound by the Fourth Circuit's clear holdings in *Virginia Beach* and *Winston–Salem* and must decide this case on the basis of those decisions.

The evidence before the board, previously discussed in detail, can be summarized as follows: the Board heard from three consulting engineers hired by plaintiff, two individuals representing plaintiff, eleven citizens, and considered a report prepared by staff members. The plaintiff's consulting engineers explained that 360° had to build a tower 40' above the tree line because of the density of the surrounding forest, that there was no or poor coverage in the Dudley Mountain area, that there were no reasonable alternatives to the Dudley Mountain site, and that the existing logging road could be constructed in accordance with applicable guidelines. Ten of the eleven citizens testifying before the Board opposed the tower. All of those testifying expressed concern about the aesthetics of the tower. Other issues raised by the citizen testimony included: fear that improvement of the logging road would result in erosion and would scar the mountain; concern that construction of this tower would lead to additional mountain top towers; opinion that "better" technology is available; belief that full coverage already exists in the Dudley Mountain area.

■ The court is of the opinion, and the growing number of cases reciting similar citizen objections supports this opinion, that the citizen concerns contained in the record are virtually certain to arise each time a wireless provider seeks to build a tower. All but the aesthetic concerns were addressed by plaintiff and its experts.[15] As for the aesthetic concern, the court will take judicial notice that, given the current state of wireless technology, cellular towers are aesthetically unpleasing. Placement of these towers in visible locations is not desirable. There may, however, be instances where an unattractive tower must be placed in a visible area to provide wireless service in compliance with the Telecommunications Act. Despite the court's concerns about the substantiality of the evidence, Fourth Circuit precedent clearly supports the Board's contention that its decision is supported by substantial evidence in the record.

Having received evidence from plaintiffs, staff, and citizens, the Board denied plaintiff's application. In denying the application, the Board applied applicable zoning ordinances[16] and relied upon the County of Albemarle's Comprehensive Plan.[17] The Board's resolution stated three essential reasons for the denial: (1) the tower's height and location on a mountain top make it visible and aesthetically unpleasing; (2) the tower is too close to adjacent land; (3) the tower would require improvement of a logging road and this improvement would disturb critical slopes and result in erosion problems. The court cannot say that the Board's

---

**15.** Though it is true that wireless providers are likely to support their applications with expert opinions, there is no reason to believe that the opinions of these independent experts cannot or should not be relied upon.

**16.** The Board specifically relied on Sections 1.4.3 and 1.6 of the Zoning Ordinance. Section 1.4.3 states that the county's zoning ordinances are intended "To facilitate the creation of a convenient, attractive and harmonious community." Section 1.6 states in part that "... development is not to be encouraged in the Rural Area which are to be devoted to preservation of agriculture and

forestal lands and activities, water supply protection, and conservation of natural, scenic and historical resources."

**17.** The Board specifically found that "Because the proposed tower would be located at an elevation of approximately 1550 feet above sea level (Record, 5) at or near the ridgeline of Dudley Mountain (Record, 6, 53, 82), and would extend 40 to 50 feet above the tree canopy, it will modify the visual character of the area." The Board also found that construction would involve the disturbance of "critical slopes."

application of the evidence before it to its zoning ordinances and Comprehensive Plan was unreasonable. *See, e.g., Ames v. Town of Painter*, 239 Va. 343, 347, 389 S.E.2d 702, 704 (1990) (decisions by local government relating to special use permits are presumed reasonable). The citizen testimony supports the Board's determination that the tower is aesthetically unpleasing and will change to some degree the character of the mountainous rural district. Citizen testimony also supports the determination that improvement of the logging road may harm the mountain and cause erosion problems. The plaintiff does not dispute that the tower is close to adjacent property and therefore violates the setback ordinance. Instead, plaintiff sought, and was denied, a setback waiver. For these reasons, the court finds that the Board's denial of plaintiff's permit application is supported by substantial evidence in the record. This determination, however, does not end the court's inquiry. 360° Communications also seeks summary judgment on the ground that the applicable zoning ordinances and Comprehensive plan have the effect of prohibiting the provision of wireless service.

### Prohibiting the Provision of Cellular Service

The Telecommunications Act provides that:

> [t]he regulation of the placement, construction, and modification of personal wireless service facilities by a State or local government or instrumentality thereof ... shall not prohibit or have

the effect of prohibiting the provision of personal wireless service.

47 U.S.C. § 332(c)(7)(B)(i)(II).

District courts facing the Act's prohibition clause have almost universally held that where the local government does not enact an outright moratorium prohibiting the construction of wireless towers, the TCA's prohibition clause has not been violated. *See, e.g., Omnipoint Communications v. City of Scranton*, 36 F.Supp.2d 222 (M.D.Pa.1999); *Bellsouth Mobility v. The Parish of Plaquemines*, 40 F.Supp.2d 372 (E.D.La.1999). These courts have, however, acknowledged that where an explicit ban is not adopted, but the government relies on ordinances or policies that have the effect of denying all permits, the Act's prohibition clause may be invoked.[18]

The First and Fourth Circuits have also indicated that ordinances and policies that do not result in an outright ban on new towers but, when applied on an individual basis, "guarantee the rejection of every application" violate the Act's prohibition clause. *AT&T Wireless PCS v. City of Virginia Beach*, 155 F.3d 423 (4th Cir. 1998) ("...we see no reason why policies that do not explicitly ban new service but do, when applied on a case-by-case basis, guarantee the rejection of every application could not also violate subsection (II)."); *Town of Amherst v. Omnipoint Communications Enters., Inc.*, 173 F.3d 9 (1st Cir.1999) ("If the criteria or their administration effectively preclude towers no matter what the carrier does, they may amount to a ban 'in effect' even though substantial evidence will almost certainly exist for the denial.") (citing *Virginia Metronet, Inc. v. Board of Supervisors*, 984

---

**18.** The District Court cases finding that a denial did not have the effect of prohibiting service are factually different from the case at hand in at least two important ways. First, all of the courts finding that a permit denial did not constitute a prohibition of service did so in regions without the unique topography of Albemarle County. Second, because courts were not presented with unique landscape characteristics, there were almost always rea-

sonable alternatives to the wireless provider's chosen site and design. The first, and to date only, district court to find that a local government's ordinances had the effect of prohibiting service did so under circumstances similar to those in this action. *See Omnipoint Communications Enters., Inc. v. Town of Amherst*, No. 97–614–JD (D.N.H. filed Aug. 21, 1998).

F.Supp. 966, 970 (E.D.Va.1998)). The Fourth Circuit, however, has yet to find that an ordinance or policy has the effect of denying service. The issue is, therefore, one of first impression in this Circuit.

Courts have not explicitly engaged in a preemption or implied preemption analysis to determine whether the TCA's prohibition clause preempts state or local laws that are applied so as effectively to preclude personal wireless service. *See, e.g., Town of Amherst v. Omnipoint Communications Enters., Inc.,* 173 F.3d 9, 1999 WL 174253 at *7; *Omnipoint Communications Enters., Inc. v. Town of Amherst,* No. 97–614–JD (D.N.H. filed Aug. 21, 1998); *Lucas v. Planning Bd. of La-Grange,* 7 F.Supp.2d 310 (S.D.N.Y.1998) ("Although the Telecommunications Act does not completely preempt the authority of state and local governments to make decisions regarding the placement of wireless communications facilities within their borders, it quite clearly preempts any state regulations which conflict with its provisions.") (citations and internal quotes omitted). Regardless, courts addressing the conflict between the Act's preservation of local zoning authority and the Act's mandate that such authority not be exercised so as to have the effect of prohibiting service, have assumed that, in those limited circumstances, the federal Telecommunications Act preempts local zoning law. This court agrees.

This does not mean that a local government cannot enact and apply legitimate zoning ordinances and guidelines that may deny some permits. State and local governments, therefore, retain the traditional zoning authority referenced in Section 332(c)(7)(A), subject only to the substantive and procedural limitations in Section 332(c)(7)(B) (denial must be based on substantial evidence, decision must be in writing, denial must not have effect of prohibiting service). Ordinances and other policies requiring, for example, that towers be a certain color, be as unobtrusive as current technology reasonably permits, and be constructed to meet safety concerns, are all permissible so long as they are not applied in a way that has the effect of denying new service. This reading of the statute's language gives effect to both sub-sections (A) and (B) by balancing the competing aims of facilitating nationally the growth of wireless phone service and maintaining local control over the zoning of towers. Any other reading would render sub-section (B)(I)(II) meaningless. *See, e.g., AT & T Wireless PCS, Inc. v. City of Virginia Beach,* 155 F.3d at 428–429.

■ State and local governments, however, may not enact ordinances or carry out policies that deny permits where there are no reasonable alternatives to the application site and the denial results in a lack of coverage.[19] This interpretation of subsections (A) and (B) may occasionally require the approval of permit applications for wireless facilities on sites highly prized by the public for their natural beauty. This court's holding, however, is narrow. There are a limited number of geographic areas where the only reasonable and effective site for a cellular tower is a mountain top. Nevertheless, any other reading by this court would effectively amend the plain language and intent of the Telecommunications Act.

■ The County of Albemarle has not enacted an explicit ban prohibiting the

---

**19.** The Board argues that plaintiff merely seeks to improve its service, not provide new service. The Board avers, therefore, that its denial cannot have the effect of prohibiting new service. This argument is not supported by the record. The only basis in the record for the Board's determination on this issue are scatter plots submitted by the plaintiff. Scatter plots are computer generated models that predict cellular coverage. The scatter plot indicates that without the tower, there are a number of areas without coverage. (Record at 118). This lack of coverage effectively prohibits new wireless service in those areas. Congress passed the TCA to develop a national framework for the deployment of telecommunications. This court must presume that Congress intended to develop a first-rate, effective framework, not one marked by gaps, dead spots, and areas without coverage.

construction of cellular towers. Instead, the Board has applied its zoning ordinances and Comprehensive plan so that applicants seeking to provide service in areas geographically similar to the Dudley Mountain region could not obtain a permit. In its "Resolution to Deny SP 98–03," the Board first relies on the Open Space Plan and Mountain Section portions of the county's Comprehensive Plan. The Mountain Section's design guidelines for houses and structures provide that: (1) structures must be located to make them unobtrusive in the landscape; (2) structures cannot be taller than the natural tree canopy; (3) structures cannot be located where they will be 'skylighted' against the horizon; (4) structures may not alter the continuity of the ridge line. The Board argues that the Mountain Section guidelines are merely advisory in nature and are not binding on the Board. The Board contends, therefore, that the guidelines cannot constitute an "in effect" ban of wireless service. The Board's actions speak louder than its argument before this court. As mentioned, the guidelines serve as the first basis in the Board's resolution denying plaintiff's permit application and the guidelines prohibitions permeate the remainder of the Board's resolution. Each succeeding basis for denial in the resolution makes reference to the tower's visibility, its location on a mountain ridgeline, and that it will change the nature of the rural area.

More importantly, where the Board applies the plain language of the guidelines to future applicants who have no reasonable alternative but to place their tower at or near the top of a mountain, that application will always fail. This runs afoul of § 332(c)(7)(B)(i)(II). To hold otherwise would be to gut the Telecommunications Act.

20. The availability of reasonable alternatives would take the permit outside the scope of the court's narrow, fact specific holding. The court's holding only applies where topographic or other geographic limitations require the construction of a tower on a mountain top.

21. There may be instances where six towers at lower elevations might constitute a reason-

The court emphasizes that if plaintiff had a reasonable alternative to the mountain top site, this court's holding would be different.[20] Plaintiff presented evidence that it explored various alternatives. Plaintiff's expert explained that its alternatives were to construct approximately six 100' towers at lower elevations (but still on the mountain) or to construct between 20 and 24 road-side antennas. (Record at 39–41). Perhaps other exceptional alternatives are available, but for an alternative to be reasonable it must, at a minimum, provide a high level of wireless service, its cost must be within or close to the industry wide norm for establishing new service under similar circumstances, it must employ commonly used technology, and it must be logistically feasible.

Plaintiff's two alternatives would concededly provide the necessary level of wireless service. The alternatives also employ widely available and widely used technology. The cost and logistical difficulties associated with the alternatives make them unreasonable. At oral argument, plaintiff represented that each of the six or 24 towers would cost the same to construct as the single mountain top tower. If wireless service providers are forced by local governments to incur such high expenses, the local government has accomplished through the backdoor what Congress has directly proscribed. State and local governments may not carry out policies that have the effect of prohibiting the deployment of new wireless service. 47 U.S.C. § 332(c)(7)(B)(i)(II). Requiring wireless providers to procure 20–24 roadside site leases or six mountain site leases[21] is an unreasonable logistical barrier that has the effect of prohibiting service.

able alternative. In this case, counsel for the Board represented at oral argument that the "vast majority" of Dudley Mountain is placed in conservation easements. The conservation easement, coupled with the general hostility of nearby residents to the construction of a tower, would make it virtually impossible for plaintiff to obtain the needed leases.

Plaintiff's have demonstrated that application of the relevant portions[22] of the county's Comprehensive Plan and zoning ordinances represents a policy that would have the effect of prohibiting new wireless service not only to plaintiff, but to all future applicants who are faced with similar geographic barriers. Plaintiff's motion for summary judgment is, therefore, granted on this basis.

**REMEDY**

■ Plaintiff asks the court to issue a mandatory injunction, directing defendant to approve plaintiff's application. Plaintiff argues that remand would be useless and would frustrate the Act's direction to expedite proceedings. The TCA does not specify a remedy for violations of the cellular siting subsection. *See* 47 U.S.C. § 332(c)(7)(B)(v) (granting jurisdiction for review of any final action that is inconsistent with the TCA and simply directing the court to "hear and decide such action[s] on an expedited basis"). The Second Circuit recently noted that despite the Act's failure to include appropriate remedies, " ... the majority of district courts that have heard these cases have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits." *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2nd Cir.1999) (citations omitted). This court is of opinion that injunctive relief best serves the TCA's explicit goal of expediting resolution of this type of action.

The Board has denied the plaintiff's application after extensive consideration. One Board member commented that plaintiff's application was the most complete application considered by the Board to date. The Board has had ample opportunity to address the plaintiff's applications and has failed to comply with the TCA.

The Record indicates the Board's hostility toward the construction of wireless towers on mountains. A remand would allow further delay and likely result in another denial of plaintiff's application. Because a remand would serve no useful purpose in this case and would be inconsistent with the purposes of the TCA, 47 U.S.C. § 332(c)(7)(B)(v), the court holds that mandatory injunctive relief ordering the defendant to approve the application and remove any barriers to the construction of the proposed towers is the appropriate remedy.

An appropriate Order shall, this day, issue.

---

**22.** The Open Space Plan and Mountain Section guidelines are part of the Comprehensive Plan.