**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

360o COMMUNICATIONS COMPANY OF
CHARLOTTESVILLE,
Plaintiff-Appellee,

v.

THE BOARD OF SUPERVISORS OF
ALBEMARLE COUNTY,
Defendant-Appellant.

KEVIN DUDLEY; BARBARA DUDLEY;
CARR DORMAN; MARGARET DORMAN;
JACOB LOESER; CONNIE LOESER;
STEPHEN INNES; BILL O. MAHONE;
IRMA MAHONE; MARYANNE
RODEHEAVER; STEPHEN THORNTON; M.

BIRD WOODS; T. K. WOODS, JR.;
DAVID VANROIJEN; JAMES MCILNAY;
MOLLY MCILNAY; JULIA SCHNEIDER;
MITCH MCCULLOUGH; EDWARD L.
AYERS; ABBY AYERS; PIEDMONT
ENVIRONMENTAL COUNCIL;
CITIZENS FOR FAUQUIER COUNTY;
SCENIC AMERICA; LOCAL
GOVERNMENT ATTORNEYS
ASSOCIATION OF VIRGINIA,
INCORPORATED; VIRGINIA
ASSOCIATION OF COUNTIES; VIRGINIA
MUNICIPAL LEAGUE; APPALACHIAN
TRAIL CONFERENCE,
Amici Curiae.

No. 99-1816

360o COMMUNICATIONS COMPANY OF
CHARLOTTESVILLE,
Plaintiff-Appellant,

v.

THE BOARD OF SUPERVISORS OF
ALBEMARLE COUNTY,
Defendant-Appellee.

KEVIN DUDLEY; BARBARA DUDLEY;
CARR DORMAN; MARGARET DORMAN;
JACOB LOESER; CONNIE LOESER;
STEPHEN INNES; BILL O. MAHONE;
IRMA MAHONE; MARYANNE
RODEHEAVER; STEPHEN THORNTON; M.

BIRD WOODS; T. K. WOODS, JR.;
DAVID VANROIJEN; JAMES MCILNAY;
MOLLY MCILNAY; JULIA SCHNEIDER;
MITCH MCCULLOUGH; EDWARD L.
AYERS; ABBY AYERS; PIEDMONT
ENVIRONMENTAL COUNCIL;
CITIZENS FOR FAUQUIER COUNTY;
SCENIC AMERICA; LOCAL
GOVERNMENT ATTORNEYS
ASSOCIATION OF VIRGINIA,
INCORPORATED; VIRGINIA
ASSOCIATION OF COUNTIES; VIRGINIA
MUNICIPAL LEAGUE; APPALACHIAN
TRAIL CONFERENCE,
Amici Curiae.

No. 99-1897

Appeals from the United States District Court
for the Western District of Virginia, at Charlottesville.
James H. Michael, Jr., Senior District Judge.
(CA-98-99-C)

Argued: January 24, 2000

Decided: March 15, 2000

Before NIEMEYER, Circuit Judge,
Deborah K. CHASANOW, United States District Judge
for the District of Maryland, sitting by designation,
and Andre M. DAVIS, United States District Judge
for the District of Maryland, sitting by designation.

_____

Reversed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Chasanow and Judge Davis joined.

_____

## COUNSEL

**ARGUED:** Larry Wade Davis, OFFICE OF THE COUNTY
ATTORNEY, Charlottesville, Virginia, for Appellant. Melvin Earl
Gibson, Jr., TREMBLAY & SMITH, L.L.P., Charlottesville, Vir-
ginia, for Appellee. **ON BRIEF:** Gustav Gregory Kamptner, OFFICE
OF THE COUNTY ATTORNEY, Charlottesville, Virginia, for
Appellant. Patricia D. McGraw, TREMBLAY & SMITH, L.L.P.,
Charlottesville, Virginia, for Appellee. George R. St. John,
ST. JOHN, BOWLING & LAWRENCE, L.L.P., Charlottesville, Vir-
ginia, for Amici Curiae Dudley, et al. Kathleen Rogers, PIEDMONT
ENVIRONMENTAL COUNCIL, Warrenton, Virginia, for Amicus
Curiae Council, et al. William Malone, John L. Knight, Henrico
County Attorney, Sterling Rives, Hanover County Attorney, C. Flippo
Hicks, Mark K. Flynn, MILLER & VAN EATON, P.L.L.C., Wash-
ington, D.C., for Amici Curiae Local Government Attorneys, et al.
Andrew T. Hyman, Harpers Ferry, West Virginia; Charles W. Sloan,
SLOAN & SWEDISH, Vienna, Virginia, for Amicus Curiae Appala-
chian Trail Conference.

_____

## OPINION

NIEMEYER, Circuit Judge:

Applying the Telecommunications Act of 1996, the district court
entered an injunction, on the motion of 360**o** Communications, Inc.,

3

directing the Albemarle County (Virginia) Board of Supervisors to issue a special-use permit to 360o Communications for the construction of a wireless communications tower on Dudley Mountain in Albemarle County. While the court concluded that the Board's denial of the permit application was supported by substantial evidence -- a conclusion with which we agree -- it held that the denial of the permit had "the effect of prohibiting the provision of personal wireless services" to the County, in violation of § 704(a)(7)(B)(i)(II) of the Telecommunications Act, 47 U.S.C. § 332(c)(7)(B)(i)(II). For the reasons that follow, we reverse.

I

360o Communications, Inc., a licensed provider of wireless telephone services, submitted an application to the Albemarle County (Virginia) Board of Supervisors for a special-use permit to erect one or more telecommunications towers near the top of Dudley Mountain in Albemarle County. 360o Communications maintained that the southern part of the County was not being provided adequate wireless service and that there were gaps in coverage of the area. Following a meeting with the staff of the Albemarle County Planning Commission, 360o Communications refined its application to request approval of only one 100-foot tower on the ridgeline of Dudley Mountain that would extend approximately 40-50 feet above the tree canopy. Dudley Mountain, which rises approximately 1550 feet above sea level, is located between U.S. Route 29 on the west and Virginia Route 706 on the east, south of Charlottesville, Virginia. 360 o Communications indicated that in constructing the tower, it would use a lattice design, painted medium-gray, and antenna mounts that would minimize the tower's profile.

At the Albemarle County Planning Commission's meeting on June 2, 1998, during which 13 citizens spoke in opposition to the tower, the planning staff recommended that the Commission deny 360o Communications' application. The staff noted that the proposed tower was inconsistent with Albemarle County's Comprehensive Plan for the development of the County. It also noted that the proposed tower would violate two provisions of the County's zoning ordinance. Finally, the staff noted that because 360o Communications had not demonstrated the lack of other feasible locations for the tower, denial

4

of the application would not have the effect of prohibiting wireless service generally. The Planning Commission unanimously recommended denial of the application to the County Board of Supervisors and scheduled a public hearing before the Board of Supervisors for August 12, 1998.

At the hearing before the Board of Supervisors, 360 **o** Communications presented evidence that it had been receiving about 20 calls per week complaining about inadequate wireless service in the Dudley Mountain area and that the proposed site on Dudley Mountain was the optimal location from which to provide the service. It presented evidence that because of the density of the forest, the tower needed to be 40 feet above the tree canopy in order to provide effective coverage. 360**o** Communications claimed that the proposed tower would be as invisible as a tower could be and still perform its intended function, and it provided photographs of the mountain that depicted a barely visible red balloon, five feet in diameter, to identify the proposed location of the tower. It assured the Board that it had met the planning staff's conditions for the access road to the site. 360**o** Communications' witnesses discussed alternatives to the single tower, including the use of six 100-foot towers at sites below the mountain ridgeline to cover the areas both to the east and west sides of the mountain or the use of 20 to 24 60-foot poles along the sides of the roads near Dudley Mountain.

Ten citizens spoke against the proposed tower, generally voicing concerns about its visibility, its inconsistency with the community's environmental preservation goals, and its impact on the character of the area. The only citizen who supported the application was the owner of the land on which the tower would be erected. Opposing citizens testified that they already enjoyed adequate cellular coverage in the area of the mountain and that, in any event, satellite communications would replace cellular service in the near future. Citizens complained about potential erosion, and one citizen, whose property was contiguous to that on which the tower would be located, testified that he placed his land in a conservation easement "just so this sort of thing would not happen." One citizen presented a petition opposing the tower signed by 40 people, and another presented a slide show showing pictures of the mountain.

5

The Board of Supervisors denied the application by unanimous vote. It determined that the proposed tower would conflict with the County's Comprehensive Plan and Open Space Plan, which encouraged the protection of mountains and rural areas and discouraged activities that would alter the continuity of the County's mountain ridgelines or disrupt the natural balance of the soils, slope, and vegetation of mountainous areas. It concluded that the tower would also conflict with guidelines recommended for mountain resource areas, of which the proposed site was a part. The Board also determined that the proposed tower would conflict with the Albemarle County Zoning Ordinance in that (1) the proposed tower would be only 40 feet from the nearest property line despite its height of 100 feet; (2) its access road would disturb steep, critical slopes; (3) the tower would change the rural character of the district due to its visibility on a wooded, sparsely populated mountain ridgeline; and (4) the tower was detrimental to the creation of a "convenient, attractive and harmonious community." The Board concluded that alternatives were available and that its decision would not prohibit wireless communication service in Albemarle County. It noted that since 1990, it had granted 18 permits for wireless communications towers and denied only 4.

360**o** Communications commenced this action under § 704(a)(7)(B)(v) of the Telecommunications Act, alleging that the Board of Supervisors' decision was not supported by substantial evidence, in violation of § 704(a)(7)(B)(iii) of the Act, and that the decision had the effect of prohibiting the provision of personal wireless services, in violation of § 704(a)(7)(B)(i)(II). On cross-motions for summary judgment, the district court concluded that substantial evidence supported the Board of Supervisors' denial of the application but that the denial of the application nevertheless had the effect of prohibiting the provision of wireless services, in violation of the Act. The court concluded that (1) the Board of Supervisors applied its zoning ordinance and its Comprehensive Plan in a manner that prevented any applicant from obtaining a permit to provide wireless services in areas geographically similar to Dudley Mountain, and (2) 360 **o** Communications' evidence demonstrated that there was no reasonable alternative to mountaintop towers in the mountainous areas such as that south of Charlottesville. Instead of remanding the case to the Board, the court issued an injunction ordering the Board to grant the permit within 45 days because of "the Board's hostility toward the construction of

6

wireless towers on mountains." 360o **Communications Co. v. Board of Supervisors of Albemarle County**, 50 F. Supp.2d 551, 564 (W.D. Va. 1999). These appeals followed.

II

Section 704(a) of the Telecommunications Act, which preserves the authority of state and local governments to regulate the placement and construction of wireless service towers, nevertheless limits the manner in which state and local governments may exercise that authority, providing that state and local governments may not deny construction of a wireless service facility unless the denial is "in writing and supported by substantial evidence contained in the written record." 47 U.S.C. § 332(c)(7)(B)(iii). We have interpreted the term "substantial evidence" to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." AT&T Wireless PCS, Inc. v. City Council of the City of Virginia Beach, 155 F.3d 423, 430 (4th Cir. 1998) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)). It requires more than a mere scintilla but less than a preponderance. See NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1044 (4th Cir. 1997). In Virginia, the grant or denial of a conditional-use permit is a legislative act, as is the adoption of a zoning regulation. See County Bd. of Arlington County v. Bratic, 377 S.E.2d 368, 370 (Va. 1989); City Council of Virginia Beach of Harrell, 372 S.E.2d 139, 141 (Va. 1988). In Virginia Beach, we stated that when reviewing the decision of a local elected body, we take "a reasonable mind" to refer to the mind of a reasonable legislator. See 155 F.3d at 430. When reviewing legislative acts to determine whether they are supported by substantial evidence, we have noted that "it is not only proper but even expected that a legislature and its members will consider the views of their constituents to be particularly compelling forms of evidence." Virginia Beach, 155 F.3d at 430.

In Virginia Beach, we concluded that the substantial opposition from local residents to an application for two cellular towers based on their rational fears that the towers would damage the character of their residentially zoned neighborhood, which contained no significant commercial development, no commercial antenna towers, and no above-ground power lines, amounted to "substantial evidence" and

7

was therefore a lawful basis for the city council's decision to deny a permit for the towers. See 155 F.3d at 431. Similarly, in AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Board of Adjustment, 172 F.3d 307, 315 (4th Cir. 1999), we held that the Winston-Salem Zoning Board had "substantial evidence" to deny a special-use permit for the construction of a 148-foot antenna tower near a historical house that was surrounded by low-density, single-home, residential property with no commercial property nearby. In Winston-Salem, approximately 150 local residents objected to the tower, either in person or by petition, because it would change the character of the neighborhood. See id. at 315-16. In contrast, in Petersburg Cellular Partnership v. Board of Supervisors of Nottoway County, we held that a county board decision, which was based upon "the irrational concerns of a few constituents," was not supported by "substantial evidence." No. 99-1055, ___ F.3d ___, 2000 WL 253605, at *___ (4th Cir. Mar. 7, 2000).

Upon judicial review of a local board's denial of a siting permit application, courts must uphold the board's action if it has "substantial support in the record as a whole." Virginia Beach, 155 F.3d at 430 (quoting Grand Canyon, 116 F.3d at 1044). Courts are not free to substitute their own judgment for that of the board, even if they would decide the matter differently as an original matter. See id. We review the district court's judgment in such cases de novo. See Pleasant Valley Hosp. v. Shalala, 32 F.3d 67, 69 (4th Cir. 1994).

In the record made before the Board of Supervisors, it is undisputed that the proposed tower would rise from the ridgeline of Dudley Mountain and extend 40 to 50 feet above the tree canopy. Except for the property owner who had intended to lease the property to 360o Communications to build the tower, the citizens of Albemarle County spoke unanimously in opposition to the tower siting. Thirteen spoke in opposition at the public hearing before the Planning Commission on June 2, 1998, giving varying reasons. Similarly, at the meeting of the Board of Supervisors on August 12, 1998, ten citizens spoke in opposition, objecting to the tower's visibility, its inconsistency with environmental preservation goals, and its impact on the character of the area. Also, 40 citizens signed a petition opposing the proposed siting of the tower.

8

In addition to this virtually unanimous citizen opposition, the Board of Supervisors had evidence before it that the proposed tower would be inconsistent with the Comprehensive Plan, the Open Space Plan, and the County's Zoning Ordinance. The Comprehensive Plan and Open Space Plan note that "any serious modification of the natural ridge lines in the County will modify the visual character of an entire area," that "activities which alter the continuity of the ridge line . . . should be discouraged," and that "issues related to soil erosion [and] surface water runoff" are amplified in mountainous areas. The Zoning Ordinance provides that the Board must find that the proposed use

> will not be of substantial detriment to adjacent property, that the character of the district will not be changed thereby, and that such use will be in harmony with the purpose and intent of [the zoning] ordinance, with the uses permitted by right in the district, with additional regulations provided in [the] ordinance, and with the public health, safety and general welfare.

Albemarle County Zoning Ordinance § 31.2.4.1. Additionally, County Zoning Ordinance § 4.10.3.1 provides that "no structure shall be located closer in distance to any lot line than the height of the structure." It was undisputed that the proposed tower was to be 100 feet tall and was sited 40 feet from the nearest lot line.

To be sure, 360o Communications presented evidence that the tower would be constructed to stand with minimal visibility and that the site would be optimal for providing service in southern Albemarle County, where gaps in service existed. It assured the Board of Supervisors that it would address the planning staff's objections to the access road and that installation of the tower would be by air (helicopter) rather than by road. It also requested a variance of the Zoning Ordinance's setback requirement. But just as 360 o Communications' position was a reasonable one, so also was the position of the citizens of the community. At bottom, these issues, as to which conflicting evidence was presented, are of the type that zoning boards are typically qualified to resolve.

Upon our view of the record, we conclude that the decision of the Albemarle County Board of Supervisors to deny 360 o Communica-

9

tions' application for a special-use permit had substantial support in the record as a whole, in satisfaction of 47 U.S.C.§ 332(c)(7)(B)(iii). See Winston-Salem, 172 F.3d at 316-17; Virginia Beach, 155 F.3d at 431.

III

Although the district court correctly found that the Board of Supervisors' decision to deny 360o Communications' permit was supported by substantial evidence, the court concluded that the denial of the permit had "the effect of prohibiting the provision of personal wireless services," in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). In reaching this conclusion, the court determined that 360o Communications had no "reasonable alternative" to a mountaintop site. 360o **Communications Co. v. Board of Supervisors of Albemarle County**, 50 F. Supp.2d at 563. In response to the evidence in the record that six towers at lower elevations on Dudley Mountain or 20 to 24 road-side towers could provide adequate service, the court agreed that these and other "exceptional alternatives" might be available, but they were not "reasonable." Id. The court said, in order to be "reasonable,"

> an alternative . . . must, at a minimum, provide a high level of wireless service, its cost must be within or close to the industry-wide norm for establishing new service under similar circumstances, it must employ commonly used technology, and it must be logistically feasible.

Id. The court also concluded that the Board of Supervisors was hostile to the construction of wireless towers on mountains and that a remand "would serve no useful purpose." Id. at 564. Accordingly, it entered an order enjoining the Board of Supervisors to "issue any required permits within 45 days." Id. at 552.

The Board of Supervisors challenges the district court's conclusions based both on the court's interpretation of the evidence and on the legal standard it applied. The Board points to the fact that reasonable alternatives did exist and that the Board had a record of granting permits for communications towers, having denied only a few. In challenging the legal test devised by the district court, the Board states that the test would "enable[ ] wireless service providers to dis-

10

regard local zoning authority merely by proposing towers that will provide the greatest coverage in a single tower by, for example, locating on a mountain top or using a very tall tower." In addition, the Board argues that there is no evidence in the record to suggest that the cost to erect one or more towers on alternative sites would be prohibitive or that it would be difficult for 360**o** Communications to obtain acceptable alternative sites.

360**o** Communications urges approval of the district court's conclusion, arguing that in the circumstances, the Board of Supervisors' denial of the special-use permit amounts to a "general ban or moratorium." It notes that because of the topography in Albemarle County, the placement of "some towers on some  mountaintops" is necessary to provide "effective [wireless] coverage." (Emphasis in original). The issue thus presented is how properly to apply 47 U.S.C. § 332(c)(7)(B)(i)(II).

Congress enacted the Telecommunications Act "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996); see also H.R. Conf. Rep. No. 104-458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124 (explaining that the purpose of the Telecommunications Act is "to provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition"). While Congress sought to limit the ability of state and local governments to frustrate the Act's national purpose of facilitating the growth of wireless telecommunications, Congress also intended to preserve state and local control over the siting of towers and other facilities that provide wireless services. It struck a balance between the national interest in facilitating the growth of telecommunications and the local interest in making zoning decisions with its enactment of § 704(a) of the Telecommunications Act, 47 U.S.C. § 332(c). Under that section, authority to regulate siting and construction of telecommunications towers is preserved in state and local governments, see 47 U.S.C. § 332(c)(7)(A), but these decisions are subject to certain limitations, see 47 U.S.C. § 332(c)(7)(B). These

11

limitations include prohibitions against discriminating among wireless service providers and against banning personal wireless services altogether. See 47 U.S.C. § 332(c)(7)(B)(i). Section 332(c)(7)(B) also requires local governments to act on permit applications "within a reasonable period of time" and not to deny applications except "in writing," and then only when "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(ii) & (iii). Finally, § 332(c)(7)(B) prohibits local governments from taking into consideration the environmental effects of radio frequency emissions. See 47 U.S.C. § 332(c)(7)(B)(iv).

The particular limitation at issue in this case reads in pertinent part: "The [local] regulation of the placement . . . of personal wireless service facilities . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II) (hereinafter sometimes, "(B)(i)(II)"). Stated another way, the provision instructs that siting decisions may not be employed to deny wireless telecommunications service. This does not mean that the denial of a permit for a particular site amounts to the denial of wireless services because services can be effected from numerous sites in various combinations, sometimes not even within the area to be served. It follows, therefore, that case-by-case denials of permits for particular sites cannot, without more, be construed as a denial of wireless services. See AT&T Wireless PCS v. City Council of Virginia Beach, 155 F.3d 423, 428-29 (4th Cir. 1998).

Certainly, local policies or general bans against any siting of wireless service facilities would violate (B)(i)(II). See Virginia Beach, 155 F.3d at 428; see also Town of Amherst v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9, 14 (1st Cir. 1999). Moreover, indications by a local government that repeated individual applications will be denied because of a generalized hostility to wireless services could also violate (B)(i)(II). But whether a single denial of a site permit could ever amount in effect to the prohibition of wireless services is a more difficult question, and it is the question with which we are here presented. Because the simple fact of denial with respect to a particular site is not enough, there must be something more, taken from the circumstances of the particular application or from the procedure for processing the application, that produces the "effect" of prohibiting wireless services.

12

Thus, conceptually, if wireless service could feasibly be provided from only one site, a denial of a permit for a facility at that site could amount to a prohibition of wireless services, in violation of (B)(i)(II). See Amherst, 173 F.3d at 14. But such a hypothetical seems unlikely in the real world, although gradations of the hypothetical are conceivable.

Moreover, because (B)(i)(II) is aimed at facilitating the development of wireless services, to evaluate whether that provision has been violated, we must determine what level of services is protected by (B)(i)(II). The Act obviously cannot require that wireless services provide 100% coverage. In recognition of this reality, federal regulations contemplate the existence of dead spots, defined as "small areas within a service area where the field strength is lower than the minimum level for reliable service." 47 C.F.R. § 22.99. And for the purpose of calculating the cellular geographic service area, the regulations provide that "cellular service is considered to be provided in all areas, including `dead spots.'" 47 C.F.R. § 22.911(b); see also Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643-44 (2d Cir. 1999) (recognizing that denials of applications to provide service to fill coverage gaps that are limited in number or size generally will not amount to a prohibition of service). In Sprint Spectrum, the Second Circuit, after carefully analyzing the various relevant provisions of the Telecommunications Act, concluded that the "services" protected by (B)(i)(II) are those that enable "mobile, handheld telephones to reach a cell site that provides access to a land-line exchange and allows phone calls to be made to and from the national telephone network" without significant gaps of coverage. Id. at 641, 643-44.

Concluding that a single denial could, in certain circumstances, violate (B)(i)(II), the Second and Third Circuits have adopted an interpretation of (B)(i)(II) under which the denial of a permit for a site that is "the least intrusive means to close a significant gap in service" would amount to a denial of wireless services in violation of that section. See APT Pittsburgh Ltd. Partnership v. Penn Township, 196 F.3d 469, 480 (3d Cir. 1999); Sprint Spectrum , 176 F.3d at 643; see also Cellular Telephone Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus, 197 F.3d 64, 70 (3d Cir. 1999). This interpretive rule effectively creates a presumption, shifting the burden of production to the local government to explain its reason for denying such an

13

application. But, as an interpretation of the Telecommunications Act, we believe this rule reads too much into the Act, unduly limiting what is essentially a fact-bound inquiry. A community could rationally reject the least intrusive proposal in favor of a more intrusive proposal that provides better service or that better promotes commercial goals of the community.

Even if we were to apply the rule formulated by the Second and Third Circuits, determinations about what constitutes the "least intrusive means" and "a significant gap" in services, would, we believe, quickly devolve into the broader inquiry indicated by the language of the statute: "Does the denial of a permit for a particular site have the effect of prohibiting wireless services?" We believe that this statutory question requires no additional formulation and can best be answered through the case-by-case analysis that the Act anticipates. See Virginia Beach, 155 F.3d at 428-29.

Accordingly, it is clear that the test devised by the district court reads far more into (B)(i)(II) than is written in the statute. The district court erroneously concluded that the denial of a permit for a particular site amounts to a prohibition of wireless service if the provider shows that it cannot through another site provide "a high level of wireless service" at a cost "within or close to the industry wide norm for establishing new service." 360o Communications, 50 F. Supp.2d at 563.

In the case before us, genuine factual disputes exist about whether there is an absence of service in the southern part of Albemarle County. If we assume that significant gaps are determined to exist,[1] there remains the larger, statutory question of whether 360o Commu-

_____

[1] Obviously, if service is already provided in an area, it would be difficult to violate (B)(i)(II), which addresses only a prohibition of the provision of service. See Sprint Spectrum, 176 F.3d at 643. And, as we have noted, "service" cannot be construed to require 100% coverage. But we need not reach the question of whether poor service or significant gaps in service in Albemarle County could amount to an absence of service because we have concluded that even if there is an absence of service, 360o Communications has not met its heavy burden under (B)(i)(II) to demonstrate that denial of the permit in this case amounts to a prohibition of the provision of service.

14

nications has met the "heavy burden" of demonstrating that denial of its application for the one particular site is tantamount to a prohibition of service. See Amherst, 173 F.3d at 14 ("[T]he burden for the carrier invoking this provision is a heavy one: to show from language or circumstances not just that this application has been rejected, but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try"). 360o Communications' own testimony acknowledges alternatives involving six towers located lower on Dudley Mountain or 20-24 towers along the highway, and surely, these are not all of the possibilities. The record contains little evidence about the feasibility of any alternatives.

Not only has 360o Communications failed to meet its heavy burden in demonstrating that the Board of Supervisors' denial of a permit for a particular site amounts to a general prohibition of service, but the Board of Supervisors has also provided affirmative evidence to the contrary. It demonstrated that it has approved 18 applications for wireless service facilities, including several from 360o Communications and a few for towers in mountain regions.

In summary, we conclude that the Board of Supervisors' decision to deny 360o Communications' application for a special permit to install a tower on the ridgeline of Dudley Mountain is supported by substantial evidence in the record. We also conclude that there is insufficient evidence in the record from which to conclude that the Board's denial of this single permit had the effect of "prohibiting the provision of personal wireless services," in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). Accordingly, the judgment of the district court is

REVERSED.

15