DAVIS, Circuit Judge,
concurring in part and dissenting in part:
The majority cogently explains the two circumstances in which a local government’s denial of a wireless facility application “ha[s] the effect of prohibiting the provision of personal wireless services” in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II): (1) where it has imposed a “ ‘blanket ban’ on wireless service,” such as a “general policy that essentially guarantees rejection of all wireless facility applications”; or (2) where there is an “effective absence of coverage” and “a lack of reasonable alternative sites to provide coverage.” Maj. Op. at 266. I agree that this statement is consistent with our precedents. I also agree that this case presents the second type of claim; T-Mobile does not allege either a blanket ban on wireless service or a general policy essentially guaranteeing rejection of all wireless facility applications.
Contrary to the majority’s conclusion, however, I am unable to conclude there is no genuine dispute that T-Mobile has failed to meet its burden on its effective-prohibition claim. A reasonable fact-finder, I believe, could conclude that T-Mobile has an “effective absence of coverage” in its wireless coverage in the vicinity of the intersection of Dolley Madison Boulevard and Georgetown Pike, and that there are no “reasonable alternative sites” to fill that gap. Thus, we should reverse and remand *274 for further proceedings on T-Mobile’s effective-prohibition claim.[1]
I.
The wireless signal generated by a particular wireless facility (i.e., a wireless antenna or group of antennas) is strongest near the facility and fades at increasing distances from it, at rates that depend on various factors: the height of the facility, the strength and frequency of the signal emitted by the facility, the surrounding geography, the density of structures in the area, and the number of customers in the vicinity, among other factors. The strength of a wireless provider’s coverage in a particular location is measured in negative dBm (decibels relative to one milliwatt). A more negative value (i.e., higher absolute value) represents a weaker signal; a value closer to zero represents a stronger signal. According to T-Mobile’s “design criteria,” in order to provide “reliable in-building coverage” to its customers at a particular location, the signal received at that location must be at least -76 dBm. Only at that level, T-Mobile has determined, can it provide “sufficient system capacity and high speed data rates” to provide reliable in-building service. J.A. 548. Reliable “in-vehicle coverage” does not require quite as strong a signal, but still requires one measuring -84 dBm. In the district court, T-Mobile submitted maps that show the strength of its coverage in the area in question. Most are radio frequency (“RF”) propagation maps, which are generated by a computer model that takes into account the factors that affect signal strength and show the various signal strengths that “can be expected” over the area. J.A. 549. Areas that receive RF signals strong enough to support reliable in-building coverage (- 76 dBm or stronger) are displayed in green; areas with signals too weak for in-building coverage, but strong enough for in-vehicle coverage (between -84 dBm and -76 dBm), are displayed in blue; areas with signals too weak even for reliable in-vehicle coverage (weaker than -84 dBm) but sufficient for “on street” coverage are displayed in yellow. These maps show that T-Mobile’s current coverage is insufficient to provide reliable in-building service in a portion of the area near the intersection of Dolley Madison Boulevard and Georgetown Pike. In some areas T-Mobile’s customers do not even receive coverage strong enough to maintain a reliable connection from inside a vehicle. These data are corroborated by a map showing “drive test data,” i.e., measurements of actual signal strength in hundreds of locations along roads in the area. The drive-test maps show miles of roads where T-Mobile’s engineers were unable to detect a signal stronger than -84 dBm.[2]
*275 To remedy this inability to provide reliable in-building and in-vehicle service to its customers living in and travelling through the area, T-Mobile decided to invest in a new wireless facility, and began investigating possible sites. One of the potential sites was the one at issue here: a ten-foot extension of a power transmission pole belonging to Dominion Virginia Power (“the Pole”), where two of T-Mobile’s competitors already had wireless facilities. A facility on the extended Pole, at a height of 108 feet, would provide reliable coverage to much more of the area than existing facilities provide, and, in T-Mobile’s view, was consistent with Fairfax County’s Comprehensive Plan, which encourages “collocation” of facilities operated by different service providers and discourages the construction of new structures.
In addition to the Pole, T-Mobile investigated more than a dozen potential alternative locations, including several identified by the County. The first set of alternatives consists of locations the Board does not dispute were not reasonably available. These include the Immanuel Presbyterian Church, which was not interested in leasing its property for a telecommunications facility; power transmission poles belonging to Dominion on the grounds of the Potomac School, which was not interested in leasing space below the poles for equipment the facilities would have required; and seven other poles belonging to Dominion, which was unwilling to lease space on those poles because there would be insufficient space for equipment and/or access to the equipment.
Similarly, a nearby park, Clemyjontri Park, was not available because its donation to Fairfax County had been conditioned on its use exclusively for park-related purposes. Two other parks, the Claude Moore Colonial Farm and Turkey Run Park, were too far north; a facility there would not fill the southern portion of the gap in reliable service. At the County’s request, T-Mobile also sought permission from the Central Intelligence Agency to install a facility within the CIA grounds; that request was denied for security-related reasons.
Two other alternatives to the 108-foot-high facility were to install (1) a 45-foot facility on the Pole, below the facilities belonging to Verizon and AT & T, or (2) a distributed antenna system (“DAS”), which consists of a network of smaller antennas at several locations rather than an installation on the Pole. T-Mobile considered these alternatives and generated RF propagation maps to determine the extent to which they would fill the gap. As those maps show and the Board does not dispute, although each of those alternatives would somewhat improve in-building and in-vehicle coverage, they would do so to a much lesser extent than would a 108-foob-high facility; a substantial portion of the areas currently without reliable in-building service would remain so. Moreover, a DAS would not work because, at least according to T-Mobile’s Zoning Manager, there were not enough existing structures in the area on which DAS equipment could be placed.
The last potential alternative, the one the majority finds fatal to T-Mobile’s claim, was the construction of a new tower in Langley Fork Park, located adjacent to a residential subdivision, Evermay. The park is owned by the National Park Service (“NPS”) and maintained by the Fair- *276 fax County Park Authority (“FCPA”). To construct a new tower in the Park, T-Mobile would need permission from both the NPS and the FCPA. For the FCPA to grant permission, T-Mobile would have to satisfy FCPA Policy 303, which requires that “all other possible locations have been exhausted by the application and that no feasible and prudent alternative exists.” J.A. 453. Although an FCPA representative attested that the FCPA “would be open to receiving” a proposal for the construction of a pole, the proposal would “trigger the compliance process.” J.A. 674. Another FCPA representative specifically stated that the Authority “would question why co-location on the nearby [Dominion] monopole outside of the park is not possible.” Id. As I understand the result reached by the majority in this case, T-Mobile must pursue this rather daunting avenue before it may come back to the Board and, if unsuccessful a second time, to the district court.
II.
As this case comes to us from the grant of summary judgment to the Board, we must view “the evidence and all reasonable inferences drawn therefrom in the light most favorable to [T-Mobile].” Henry v. Purnell, 652 F.3d 524, 531 (4th Cir.2011) (en banc). This evidence presents two questions, as the majority agrees: First, could a reasonable fact-finder conclude that the absence of reliable in-building coverage and, to a lesser extent, reliable in-vehicle coverage, in the vicinity of the proposed facility, constitutes an “effective absence of coverage”? Second, if there is an effective absence of coverage, could a reasonable fact-finder conclude that T-Mobile has shown there are no “reasonable alternative sites to provide coverage”?
A.
As an initial matter, I discern no meaningful difference between what the majority calls an “effective absence of coverage,” Maj. Op. at 266, (or elsewhere a “legally cognizable absence in coverage,” id. at 267, or a “legally cognizable deficit in coverage,” id. at 268) and what a prior panel on which I served referred to as a “significant gap.” In 360° Communications Co. v. Board of Supervisors of Albemarle County, 211 F.3d 79 (4th Cir.2000) (“Albemarle County ”), we assumed without deciding that “significant gaps are determined to exist,” id. at 87-88, and thus expressly reserved the question whether “poor service or significant gaps in service” such as those in Albemarle County “could amount to an absence of service.” Id. at 88 n. 1. We were able to avoid that question because there was evidence of at least two alternative means to provide coverage in the area in question but no evidence in the record of their “feasibility.” Id. at 88. Thus, regardless of whether there was a significant gap, the wireless provider could not show it was unable to fill that gap by means other than the facility that had been rejected. Id.
Similarly, in USCOC of Virginia RSA# 3, Inc. v. Montgomery County Board of Supervisors, 343 F.3d 262 (4th Cir.2003) (“Montgomery County”), there was an alternative plan that would provide coverage that was “[equivalent” to that which the rejected plan would have provided. Id. at 266. Because the case was not one in which “the service could only be provided from a particular site,” the wireless provider could not meet its burden, regardless of the extent of any gap in reliable service. Id. at 268. In AT & T Wireless PCS, Inc. v. City Council of the City of Virginia Beach, 155 F.3d 423 (4th Cir.1998) (“Virginia Beach ”), we also did not consider whether the wireless provider *277 could prevail on the “effective absence of coverage” question. See id. at 428-29.[3]
Thus, the question of when a wireless provider’s inability to provide reliable in-building and/or in-vehicle coverage constitutes an “effective absence of coverage” is one of first impression in this circuit. We have never before needed to decide whether a particular level of coverage in a particular geographic area constitutes an “effective absence of coverage.”
It is true that in Albemarle County we rejected the test employed in the Second and Third Circuits for determining whether the existence of an alternative site would defeat a wireless provider’s effective-prohibition claim. That is, we rejected a test that would compare the “intrusive[ness]” of a rejected facility with that of any alternatives, and allow a wireless provider to prevail if its proposed facility would be the “least intrusive means” by which it could close an existing gap in “service.” 211 F.3d at 87. We did not, however, quarrel with the approach those circuits had taken to the “significant gap” prong of the analysis — as the majority acknowledges. See Maj. Op. at 266 (noting that Albemarle County rejected the Second and Third Circuits’ test only “[wjith regard to the requirement that a plaintiff demonstrate the absence of reasonable alternatives”).
For these reasons, I would forthrightly follow Albemarle County’s lead in requiring evidence of a “significant gap” in coverage as the first prong of the second type of effective-prohibition claim. That is, I would avoid the majority’s preference for the “effective absence of coverage” gloss when “significant gap” would do just fine. But ultimately that choice is inconsequential, for two reasons: (1) there is no discernible difference between those standards and (2) ultimately its discussion of the “effective absence of coverage” test is dicta, because it decides the case solely on the laek-of-reasonable-alternatives prong. Thus, for simplicity’s sake, I will adopt the same formulation as that of the majority.
The upshot of our prior treatment of the question is that whether there is an effective absence of coverage is highly fact-specific, one that requires “case-by-case analysis.” Albemarle County, 211 F.3d at 87. The other circuits that have considered the question have agreed. The First Circuit, which has provided the most thorough explanation of the contours of this analysis, provided a non-exclusive list of considerations that are generally relevant to whether there is a “significant gap”: “the physical size of the gap, the area in which there is a gap, the number of users the gap affects,” and the percentage “of unsuccessful calls or inadequate service during calls in the gap area,” as well as “whether all of the carrier’s users in that area are similarly affected by the gaps.” Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 49 (1st Cir.2009) (“Cranston ”).
In Cranston the district court had weighed the relevant factors after a bench trial that included competing expert testimony, and adopted as a “yardstick” -84 *278 dBm as a proper marker in those circumstances for determining whether there was a significant gap in coverage. Id. Because the district court’s choice of - 84 dBm as a threshold and its weighing of the evidence were not clearly erroneous, the First Circuit affirmed the district court’s entry of judgment for the wireless provider. Id. Similarly, in MetroPCS, Inc. v. City of San Francisco, 400 F.3d 715 (9th Cir.2005), the Ninth Circuit, accepting jurisdiction over an interlocutory appeal certified by the district court, id. at 720, affirmed the denial of cross-motions for summary judgment, in part because the record was “replete with contradictory allegations” as to MetroPCS’s need to install the wireless facility at issue. Id. at 733. The court explained, “While we recognize that the TCA does not guarantee wireless service providers coverage free of small ‘dead spots,’ the existing case law amply demonstrates that ‘significant gap’ determinations are extremely fact-specific inquiries that defy any bright-line legal rule.” Id.
It is true that in dicta in Albemarle County we pondered the frequency with which “wireless service could feasibly be provided from only one site,” and conjectured that “such a hypothetical seems unlikely in the real world, although gradations of the hypothetical are conceivable.” 211 F.3d at 86-87. We did not, however, have occasion to decide what level of “service” the Act entitles wireless companies to provide, instead deciding that, regardless of whether there was a gap in coverage, the existence of alternatives to fill that gap defeated the wireless provider’s claim. The majority opinion here thus is wise to avoid giving unwarranted weight to that dicta. As we now know, having wrestled with the implications of 47 U.S.C. § 332(c)(7)(B)(i)(II) alongside our sister circuits for fifteen years, there may very well be scenarios where, as a practical matter, very few sites — and perhaps just one site — would allow a wireless provider to remedy a “legally cognizable deficit in coverage.” It may be true that such scenarios are “unlikely,” Albemarle County, 211 F.3d at 87, and accordingly a wireless provider may find its burden of demonstrating an effective prohibition to be a “heavy” one. But that does not excuse us from deciding whether a particular wireless provider’s claim presents such a scenario, just as it does not alter the ordinary burden of proof in a civil case like this one: preponderance of the evidence. In my view, the two-pronged test the majority articulates provides a workable test for making that determination.
In this case, the district court declined to engage in any analysis of the extent of T-Mobile’s inability to provide reliable wireless coverage because it read our precedents as allowing an effective-prohibition claim only where there is a “complete absence of T-Mobile’s wireless service in the area.” T-Mobile Northeast LLC v. Fair-fax Cnty. Bd. of Supervisors, 759 F.Supp.2d 756, 770 (E.D.Va.2010). As mentioned, it declined even to consider the admissibility of T-Mobile’s maps because they would be relevant, the court apparently believed, only if they showed areas with no detectable RF signal at all; because the maps showed T-Mobile could provide some signal in the area, the maps were not “material.” Id. at 769 n. 23. As the majority seems to agree, this reasoning was mistaken, though certainly understandable given the obscurity of our precedents to date. See Maj. Op. at 267 (stating the issue as whether T-Mobile is “unable to provide sufficient, reliable in-vehicle and in-building coverage in the area at issue”); see also Montgomery County, 343 F.3d at 269 (noting there were alternative means to provide “quality wireless service” (emphasis added)).
*279 The problem is, while the majority clarifies some aspects of our analysis, I am afraid it muddles other aspects of our analysis. While the Telecommunications Act does not guarantee “100% coverage” and “federal regulations contemplate the existence of dead spots,” Albemarle County, 211 F.3d at 87, the majority recognizes that at some point a wireless provider’s inability to provide reliable service in a particular area becomes so significant that it amounts to an “effective absence of coverage.” Maj. Op. at 266. Having recognized this possibility, however, the majority later states that the language of subsection (B)(i)(II) “does not encompass the ordinary situation in which a local governing body’s decision merely limits the level of wireless services available.” Maj. Op. at 268.
The unavoidable tension between these pronouncements illustrates the shortcomings of the majority’s approach. The only way the latter could logically follow from the former is if we were to hold that a wireless provider could only prevail on an effective-prohibition claim if there were no detectable RF signal in the area in question. Although, admittedly, our prior cases include language hinting at such a requirement, we never actually adopted the standard, as explained above — and no circuit has come close to adopting such an extreme approach. In fact, while the circuits have split on the second prong of the effective-prohibition analysis, those that have considered the question have uniformly approached the first prong by asking whether there is a “significant gap” in coverage. See Cranston, 586 F.3d at 48; T-Mobile USA v. City of Anacortes, 572 F.3d 987, 995 (9th Cir.2009); VoiceStream Minneapolis, Inc. v. St. Croix County, 342 F.3d 818, 834 n. 7 (7th Cir.2003); APT Pittsburgh Ltd. P’ship v. Penn Twp. Butler Cnty., 196 F.3d 469, 480 (3d Cir.1999); Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir.1999) (“Willoth ”).[4]
The majority apparently recognizes that we should not split with our sister circuits and go down that lonely road, as ultimately it does not decide whether there is a triable issue on the effective-absence-of-coverage prong. But this renders even more inexplicable its statement in dicta that subsection (B)(i)(II) does not grant relief if a local government “merely limits” a wireless provider’s coverage. Rather, because subsection (B)(i)(II) surely is not limited to areas without any detectable RF signal, the subsection must necessarily “encompass” a scenario in which a local government’s decision “limits the level of wireless services available,” where that decision leaves the provider with a significant gap in reliable coverage.
Because a wireless device requires not just some signal to provide rehable service but rather a sufficiently strong signal, the question whether a gap in service is significant is one of degree, and necessarily depends on a variety of factors, such as those enumerated by the First Circuit in Cranston. If the Board’s decision here had prevented T-Mobile from providing, say, even a -100 dBm signal for large *280 swaths of populated areas of McLean, which apparently would be insufficient for almost any use of a wireless device, then presumably (though we need not decide) T-Mobile could show an effective absence of coverage, i.e., a significant gap. Conversely, if the Board’s decision had prevented T-Mobile from providing reliable in-building coverage to merely a handful of homes, then we might have needed to decide (though here, we need not) whether the “effective absence of coverage” was de minimis and therefore no reasonable fact-finder could conclude T-Mobile is entitled to relief. See Willoth, 176 F.3d at 643-44 (noting in dicta that “[w]here the holes in coverage are very limited in number or size (such as the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the area covered by buildings increases) the lack of coverage likely will be de minimis so that denying applications to construct towers necessary to fill these holes will not amount to a prohibition of service”). Indeed, T-Mobile conceded this latter possibility at oral argument. Oral Arg. Tr. at 8:25.
On the facts here, the core problem with the majority’s effective-absence-of-coverage analysis (though not its holding, as ultimately it avoids deciding the issue) is its failure to acknowledge that this case does not present either extreme scenario. Even the Board concedes that in the vicinity of the Pole there is a “mix” of areas with varying strengths of coverage, in only some of which T-Mobile’s customers receive reliable in-building coverage. Appellee’s Br. at 23. T-Mobile presented evidence that in a substantial portion of the area in question, which includes developed residential areas and heavily trafficked roads, a T-Mobile customer would be unable to reliably use T-Mobile’s wireless network, especially from inside homes and buildings, but also at times from inside vehicles — and even sometimes just standing outside. Indeed, the Board does not seem to dispute any of that evidence. Thus, we are squarely presented with the question whether those deficiencies in coverage rise to the level of an “effective absence of coverage.”
We could, of course, avoid this question if T-Mobile’s claim failed as a matter of law on the lack-of-reasonable-alternatives prong. This is the tack the majority takes, concluding, as it does, that T-Mobile failed as a matter of law to satisfy its burden on the laek-of-reasonable-alternatives prong. In certain circumstances, such as in Albemarle County, that is a tenable approach. Unlike in Albemarle County, however, T-Mobile has presented substantial evidence concerning alternative sites, evidence that, in my view, precludes us from avoiding the question we reserved in Albemarle County, as I will explain below. Accordingly, I believe we must decide whether a reasonable fact-finder could conclude that T-Mobile has proven an “effective absence of coverage.”
In my view, between T-Mobile’s RF propagation maps, drive-test map, affidavits, and other evidence, the answer must be “yes.” Whether a particular number of customers in a particular geographic area cannot reliably use cellular wireless devices indoors and whether that absence of in-building service constitutes an effective absence of coverage are fact-intensive questions, ones on which, on the facts presented here, reasonable fact-finders could disagree. Although we do not know some details of the scope and extent of the gap in coverage, such as precisely how many homes are affected or how often T-Mobile’s network drops calls made in the area in question, a party seeking to defeat summary judgment need not prove every fact it would prove at trial; it need only proffer sufficient evidence to show that it could *281 prevail at trial. This, I believe, T-Mobile has done.[5]
B.
This brings me to the second question: whether T-Mobile has shown that a reasonable fact-finder could conclude there are no “reasonable alternative sites to provide coverage.” As the majority notes, the standard we apply as to this second prong of the effective-prohibition analysis differs slightly from that adopted by the Second, Third and Ninth Circuits. Those courts, instead of requiring a “lack of reasonable alternative sites,” require that the proposed facility be “the least intrusive means” to close the gap in service. See MetroPCS, 400 F.3d at 734; APT Pittsburgh Ltd., 196 F.3d at 480; Willoth, 176 F.3d at 643. In Albemarle County, we expressly rejected the “least intrusive means” test as “read[ing] too much into the Act,” instead leaving the factual analysis to be conducted on a “case-by-case” basis. 211 F.3d at 87. Likewise, the First Circuit has also declined to define the sec-
ond prong and instead left it as a “factual question for the trial court to resolve.” Cranston, 586 F.3d at 52.
As the majority explains, instead of engaging in a comparative “intrusive[ness]” analysis, we instead inquire into whether a wireless provider has shown that there is “a lack of reasonable alternative sites to provide coverage.” Maj. Op. at 266. This standard incorporates, as it must, two subsidiary questions: (1) whether a proffered alternative exists, i.e., is “technically infeasible [or] practically unavailable,” Maj. Op. at 267, and (2) whether in fact the alternative would “provide coverage,” i.e., would effectively fill the existing gap.[6] We have previously explained that whether a particular alternative site is reasonably available depends on whether “further reasonable efforts are so likely to be fruitless that it is a waste of time even to try.” Albemarle County, 211 F.3d at 88. We do not require providers “to endure repeated denials by local authorities until only one feasible alternative remained,” a standard *282 that would be “a poor use of time and resources for both providers and local governments alike.” MetroPCS, 400 F.3d at 734. “Ultimately the question is a practical inquiry into feasible, available alternatives.” Cranston, 586 F.3d at 52-53. As the First Circuit has explained, the purpose of inquiring into the existence of alternatives and their feasibility is to balance “competing interests”: (a) the need for wireless carriers to “build more facilities, especially in populated areas, to continue providing reliable coverage,” (b) the importance of “promoting competition in the wireless communications market,” and (c) “local governments’ primary authority to regulate land use.” Id. at 51-52.
We considered these questions in both Albemarle County and Montgomery County. In both cases, the effective-prohibition claims failed as a matter of law because the wireless providers had not shown an absence of reasonable alternative sites to provide coverage. In Albemarle County, the wireless provider had acknowledged there were alternative sites, and had failed to provide evidence that those alternatives were not “feasible.” 211 F.3d at 82. In Montgomery County, not only was there an alternative facility (a 195-foot tower instead of a 240-foot tower) that “would provide wireless capabilities to a significant area of the county currently without quality wireless service”; the county had in fact already granted a permit for an alternative tower. 343 F.3d at 268-69.
Here, in contrast, T-Mobile has offered substantial evidence that, to the extent there are alternative sites from which T-Mobile could provide coverage, those alternatives either (a) are not reasonably available or (b) would not fill the existing gap in coverage. Most of that evidence the Board does not dispute. There are three alternatives, however, the Board argues T-Mobile has not adequately shown are either not reasonably available or would not fill the gap: a new tower in Langley Fork Park; a 45-fooi>-high facility on the same Dominion Pole it sought to extend for a 108-foot-high facility; and a distributed antenna system.
The majority finds the possibility of constructing a new tower in Langley Fork Park fatal to T-Mobile’s claim. I agree that if the Park truly were a “reasonable alternative,” then that fact alone would be fatal to T-Mobile’s claim; the denial of the Dominion pole application would not effectively prohibit T-Mobile from providing wireless services in the area, regardless of whether the existing gap in coverage is significant. But, in my view, on this record, T-Mobile could convince a reasonable fact-finder that constructing a new tower in the Park is not a reasonable alternative.
As T-Mobile showed, the Fairfax County Park Authority would only be willing to approve the construction of a cellular tower in the Park if “all other possible locations have been exhausted” and if “no feasible and prudent alternative exists.” J.A. 453. This put T-Mobile in a Catch-22: it could construct a tower in the Park only if there were no other “feasible and prudent alternative[s],” id., but could prevail on an effective-prohibition claim only if the Park was “practically unavailable” as an alternative. Maj. Op. at 267. Furthermore, although an NPS representative said the NPS “would be open to receiving” a proposal for the construction of a pole, the submission of such a proposal would merely “trigger the compliance process,” J.A. 674, and an FCPA representative specifically told T-Mobile that the FCPA “would question why co-location on the nearby [Dominion] monopole outside of the park is not possible.” J.A. 453. Finally, as T-Mobile represented at oral argument (without contradiction), the FCPA has nev *283 er approved the construction of a cellular tower in Langley Fork Park.
Given this conflicting evidence on the dispositive issue, “reasonableness,” only if the summary judgment standard were flipped on its head could the majority’s conclusion withstand scrutiny. I fail to see how no reasonable fact-finder could conclude, based on this evidence, that further “reasonable efforts” to obtain permission to build a new tower in the Park “are so likely to be fruitless that it is a waste of time even to try,” Albemarle County, 211 F.3d at 88, or, in the majority’s words, “would be futile.” Maj. Op. at 269. Surely the majority does not mean to require T-Mobile “to endure repeated denials by local authorities until only one feasible alternative remained.” MetroPCS, 400 F.3d at 734, a requirement that would run contrary to the Act’s express goal of “encourag[ing] the rapid deployment of new telecommunications technologies.” Pub.L. 104-104, 110 Stat. 56, 56 (1996). The question is simply a much closer question than was the feasibility of the alternatives at issue in Albemarle County and Montgomery County, and far too close to be resolved on summary judgment.[7] Although perhaps T-Mobile’s argument would be stronger if it had developed the record before the Board somewhat more on the unlikelihood of winning approval for a pole in the Park, its failure to do so does not, in my view, preclude a reasonable fact-finder from finding that further reasonable efforts to obtain permission from the FCPA are likely to be fruitless.[8]
Because I believe a reasonable fact-finder could conclude the Park was not a reasonably available alternative, I would reach the question of the availability of the two other alternatives: a distributed antenna system and a 45-foot facility on the Pole, below AT & T’s and Verizon’s facilities. If we could say that these alternatives were reasonably available and that the gap that would remain would not be significant — and that no reasonable fact-finder could conclude otherwise — then the existence of one or both of these alternatives would defeat T-Mobile’s claims as a matter of law. The fundamental problem with that approach is that T-Mobile’s RF propagation maps show that both a DAS and a 45-foot facility would fill only part of the existing gap in reliable in-building coverage. This brings us right back to the vexing question the majority wishes to avoid: at what point does a wireless provider’s inability to provide reliable in-building or in-vehicle service rise to the level of an effective absence of coverage? This *284 question cannot be resolved as a matter of law on these facts for the same reasons as those stated above.[9]
C.
For these reasons, in my view, there are genuine issues of material fact on both prongs of our effective-prohibition analysis. Our review of an effective-prohibition claim might look different if there were properly promulgated FCC regulations setting particular threshold coverage levels subsection (B)(i)(II) entitles a company like T-Mobile to provide. But the agency has not acted on this question, and so we are left with the fact-intensive questions of whether T-Mobile’s gap in service constitutes an “effective absence of coverage” and whether potential alternative sites are “reasonable.” Thus, as in any such case, we should remand. Presumably, the parties would proceed to a bench trial, though conceivably the district court could decide that additional discovery and/or renewed motions for summary judgment, or possibly further remand to the Board, would be appropriate, now that we have clarified the standard we apply in effective-prohibition cases.
III.
For these reasons, although I join the court’s opinion as to T-Mobile’s unreasonable-discrimination claim, I respectfully dissent from its disposition of T-Mobile’s effective-prohibition claim.

. Although I dissent from the majority’s disposition of the effective-prohibition claim, I concur in its affirmance of the district court’s grant of summary judgment to the Board on T-Mobile’s unreasonable-discrimination claim.

. The Board contested the admissibility of all of these maps on several grounds, including that T-Mobile did not disclose its experts, whose declarations included the maps as attachments, early enough for the Board to conduct discovery regarding those witnesses to the extent they were serving as expert witnesses. The district court never ruled on the Board’s objections to the admissibility of the declarations because it was applying a test under which any detectable RF signal would defeat a wireless provider's effective-prohibition claim; under that standard, the declarations and maps would have been irrelevant. As the majority holds and I agree, this was error, because in this circuit, we do inquire into whether there is an "effective absence of coverage.” Because the district court’s basis for declining to rule on their admissibility was erroneous, for purposes of this opinion, I assume the maps are properly in evidence. If we were to vacate and remand this action, as *275 I believe we must, the district court would then be in position to exercise its discretion to decide whether the maps should be excluded from evidence based on the timing of T-Mobile’s expert disclosures.

. I agree with the majority that the FCC’s Declaratory Ruling, regardless of whether it was properly promulgated, does not affect our analysis. All the FCC ruled was that a city effectively prohibits wireless services if it denies an application "solely because that service is available from another provider.” In re Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B), 24 F.C.C. Red. 13994, 14000 (2009). That "one-provider rule" was not at issue in Virginia Beach, Albemarle County or Montgomery County, and is not at issue here. To the extent the Declaratory Ruling also questioned particular aspects of our reasoning in Virginia Beach, see id. at 14017, those concerns were rendered moot by Albemarle County and Montgomery County.

. The Eighth Circuit has not adopted a particular standard, but in USCOC of Greater Iowa, Inc. v. Zoning Board of Adjustment of the City of Des Moines, 465 F.3d 817 (8th Cir.2006), assumed without deciding that a zoning board’s decision that prevents a wireless provider from improving service in "a relatively small area [where its service is] less than optimal” could constitute an effective prohibition, so long as the provider has "adequately investigate[d] all feasible alternative sites.” Id. at 825. There, the provider’s claim failed because it failed to conduct a reasonable investigation of alternatives and so the court was "unable to conclude that the [site at issue] was the only location for a cellular tower that would remedy USCOC's coverage issue.” Id.

. In this regard, it is difficult to know what to make of our good friend's concurring opinion, which is offered to “emphasize the 'substantial burden’ that a plaintiff bears in seeking to show a violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).” Why a separate opinion is needed to voice such "emphasis” is quite unclear. Amorphous formulations such as "substantial burden” and "heavy burden” rarely aid analysis of actual cases; such formulations are descriptive, not prescriptive. No one believes it is or should be "easy ” for a wireless service provider to persuade a court to reject a local zoning authority’s decision denying a requested permit. But absolutely nothing in our precedent (or any other court’s precedent) suggests that the customary civil risk of non-persuasion (preponderance of the evidence) or well-settled Rule 56 summary judgment standards (absence of genuine disputes of material fact and entitlement to judgment as a matter of law) do not apply under the Act. Surely, the concurrence agrees with this statement.
Moreover, the assertion that I am “bend[ing] over backward” misses the mark entirely. See Concurring Op. at 273 n. *. T-Mobile’s alleged concession at oral argument is quite accurate: under the erroneous view of the law applied by the district court, which believed our precedents required a "blanket ban” for a service provider to prevail in an effective prohibition case, T-Mobile (and any similarly-situated service provider) does lose. Fortunately, despite the confusion evident in the concurrence, the majority opinion soundly rejects the “blanket ban” formulation, and in any event escapes confronting prong one, the "effective absence of coverage” issue, by deciding the case solely on prong two, the "reasonable alternative” issue. Thus, T-Mobile’s concession is irrelevant to the disposition of this case.

. This is similar to the Seventh Circuit’s approach, which requires a wireless provider to show that the proposed facility is the "only feasible plan.” VoiceStream Minneapolis, 342 F.3d at 833, 834-35 (7th Cir.2003).

. Whether "future attempts to gain approval for [other] wireless facilities to enhance its coverage” in Fairfax County would be fruitless, and whether the Board "has a strong history of approving wireless facilities, including applications for wireless facilities submitted by T-Mobile,” Maj. Op. at 269, are irrelevant to this category of effective-prohibition claims. The question is whether approval for the specific alternatives at issue (e.g., a new tower in Langley Fork Park) is so unlikely that it would be a waste of time for T-Mobile to try.

. It seems T-Mobile did not present an RF propagation map showing the extent to which a new tower in the Park would provide reliable in-building service to T-Mobile customers in the area who are currently without such service. But that failure does not mean its claim fails as a matter of law, because whether an alternative would provide adequate coverage is only part of the analysis under the lack-of-reasonable-alternatives prong. If a proffered alternative is simply not practically available, then a wireless provider can prevail, regardless of whether the alternative site would provide adequate coverage. Thus, T-Mobile’s apparent decision not to demonstrate the coverage a tower in the Park would provide simply means that, to prevail, it must show that further reasonable efforts to seek permission to construct such a tower are likely to be fruitless.

. Because a reasonable fact-finder could conclude that a DAS or 45-foot facility would not fill the effective absence of coverage, this case is not one where a wireless provider rejected an alternative site or alternative technology solely on the basis of cost. Thus, we need not decide whether a potential alternative that is technically feasible and would fill an existing gap, but would be very expensive to implement, would be rendered "practically unavailable” on the basis of cost.